### BARTON BROS. et al. v. TEXAS PRODUCE CO. et al.

(Circuit Court of Appeals, Eighth Circuit. April 4, 1905.)

No. 2,105.

1. FEDERAL COURTS—FINDINGS BY TRIAL JUDGE—REVIEW.
  The Circuit Court of Appeals will not disturb the conclusion of a trial judge on disputed questions of fact, where the hearing was on oral testimony, except for cogent reasons, such as a palpable mistake or misconception of the decided weight of the evidence.

2. BANKRUPTCY—DISCHARGE—OBJECTIONS—FALSE OATH—SCHEDULES.
  On an application for bankrupt's discharge, evidence *held* to sustain a finding that the bankrupts had been guilty of making a false oath to their schedules, etc., in fraudulently failing to schedule certain money received shortly before the bankruptcy proceedings were instituted, and claimed by them to have been stolen.

Appeal from the District Court of the United States for the Western District of Arkansas.

Joe Hardage, T. N. Wilson, George B. Pugh, and R. E. Wiley, for appellants.

William H. Arnold, Oscar D. Scott, and James D. Head, for appellees.

Before SANBORN, Circuit Judge, and PHILIPS and RINER, District Judges.

PHILIPS, District Judge. The partnership firm of Barton Bros. was composed of Clib Barton, William P. Barton, Jr., and Ross J.

Barton, engaged in mercantile business at Antoine, Pike county, Ark. On the 28th day of November, 1902, on the petition of appellees, the said partnership and the individuals thereof were adjudged involuntary bankrupts, on their admission in writing of their inability to pay their debts and their willingness to be adjudged bankrupts. In August, 1903, Clib Barton died. On October 6, 1903, William P. Barton, Jr., and Ross J. Barton filed a petition asking for a discharge in bankruptcy for the firm of Barton Bros. and for themselves individually. On November 5, 1903, appellees filed specifications of objection to the discharge, which specifications were afterwards amended. The first specification alleged that on the 11th day of December, 1902, said William P. Barton, Jr., and Ross J. Barton, respectively, falsely and fraudulently made oath that the schedule of assets filed by them contained all of their real and personal property, when in fact said schedule of assets did not contain a large sum of money, to wit, about $8,000, which had been received by said bankrupts upon the sale of a large lot of cotton a few days prior to the proceedings in bankruptcy, and that said sum of money was in the possession of the bankrupts at the time they filed their schedule of assets in bankruptcy and at the time they made said oath; second, that they falsely and fraudulently made oath that the list of personal property scheduled and claimed by them as exempt contained all the personal property, of whatever kind, when, in truth, said schedules of exemptions did not contain a large sum of money, to wit, about $8,000 received by them as the proceeds from the sale of the cotton aforesaid, which said sum of money was in their possession at the time they filed said schedules. The hearing of these objections to the discharge was had before the District Judge on oral testimony, at the conclusion of which the court denied the petitions for discharge, from which action of the court the petitioners have appealed to this court.

The evidence, without contradiction, showed that on or about the 25th day of November, 1902, Clib Barton, who was the active manager of the business, went to Little Rock, Ark., and sold a lot of cotton of the firm, and received therefor between seven and eight thousand dollars in money, in packages of fifty and one hundred dollar bills, which he brought home and delivered to William P. Barton, Jr., who was the bookkeeper of the firm, who claims to have put the package containing the money in an ordinary wooden desk, with a roller top, and inside of a drawer inclosed with a door, and that he locked the door and the desk, where the money, according to the petitioners' statement, remained during Friday night and Saturday and Saturday night following, when they allege the storehouse was burglarized, and the desk opened, and the money abstracted and stolen. This was a simple question of fact for the determination of the trial court on the evidence. The function of the District Judge on such a hearing is akin to that of a chancellor in an equity proceeding. Where, as in this case, the hearing was on oral testimony, his conclusions on disputed questions of fact should not be disturbed by the appellate court, except for cogent

reasons, such as a palpable mistake or misconception of the decided weight of the evidence. Furrer v. Ferris, 145 U. S. 132, 12 Sup. Ct. 821, 36 L. Ed. 649; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Lansing et al. v. Stanisics et al., 94 Fed. 380, 36 C. C. A. 306; Snider et al. v. Dobson et al., 74 Fed. 757, 21 C. C. A. 76; Warren v. Burt et al., 58 Fed. 101–106, 7 C. C. A. 105; Latta et al. v. Granger, 68 Fed. 69, 15 C. C. A. 228; Paxson et al. v. Brown et al., 61 Fed. 874, 10 C. C. A. 135; Stuart v. Hayden et al., 72 Fed. 402, 18 C. C. A. 618. The learned judge who heard this case patiently for two days, with opportunity to observe the witnesses, their conduct on the stand, with probable personal knowledge of what manner of men they were, was in better position to form a correct estimate of the probative force to be attached to their testimony than this court can form from the more or less imperfect expression of the testimony in type.

A careful reading of the record has failed to persuade us that injustice has been done appellants by denying their petition for a final discharge from their debts. The spirit of the bankrupt act is commendable. Its purpose is to release the honest debtor from the burden of debts which he is unable to longer carry; to give freer play to his energies and enterprises, that he may thereafter be better able to support himself and those dependent upon his earnings, and thereby be in position to render a better service to the state and to society. This beneficent policy is conditioned always upon the bankrupt's full and complete surrender of all his unexempt property for the benefit of his creditors. He must be honest in this respect. He must neither conceal nor withhold knowingly anything from his creditors which they are entitled, under the law, to know or receive. Whenever the court is impressed with the belief, after due inquiry and examination, that in the main the bankrupt has intended and tried to comply with the law, he should be dealt with liberally on his petition for manumission from his debts. On the other hand, in order to obstruct gross abuses of the spirit of the bankrupt act, that it may not aid the dishonest debtor in being acquitted of his honest debts, while withholding aught that he should surrender for the benefit of his creditors, it is the duty of the court to look into the heart of his transactions.

When the partners received between seven and eight thousand dollars for said cotton, their assets reduced to cash were inadequate to meet their liabilities. They had past-due obligations to creditors. This large amount of cash, without notice of its possession to their creditors, was placed in an insecure wooden desk in a public store, and left unguarded for two whole nights. This money was not entered by the bookkeeper on the cashbook of the company. It was not even counted by said bookkeeper, for the flimsy reason, assigned by him, that he was busy, and for the lack of opportunity to make the count without exposing the money to the public, although two nights had intervened, when they would have had the privacy of their own counting room for such purpose. The three partners knew of the deposit of this money in said desk. There was a large safe in the storeroom, which, while it may not

have been burglar proof, was a much safer place for money against an accident of fire. William P. Barton, Jr., claims to have left the store the evening before the alleged burglary, and gone to his home, where he remained all night. The other two brothers were in the store after he left, and were in there when the principal clerk left. All the doors to the storeroom were securely fastened from the inside, except the front door, which was locked from the outside. On the following Sunday morning the loss of this money was proclaimed by William P. and Ross Barton, and when third parties reached the store the back door was open, and a window in the rear of the building was shown to be raised, and there was a goods box on the outside, below this window, to indicate that the entrance to the building might have been effected through said window. But the presence of a layer of dust on the sill of the window, and cobwebs on the inside thereof, undisturbed, disproved the entry of any person through the window. The physical condition of the desk just after the loss of the money was proclaimed well warranted the conclusion that the person or persons who abstracted the money accomplished their work by having keys to the front door of the storehouse and to the desk. There was no indication of any breaking of the outside roller to the desk, nor any evidence of a violent entry into the drawer or the door inside of the desk. It is true that the door was found open and wrenched from the hinges, but as these hinges were inside of the door, and the lock of the door was unbroken, this wrenching of the door from its hinges could only have been done after the door itself was opened with a key. All of which indicated that the job was done by a bungler, who sought inconsiderately to leave evidence of a violent entry, which was transparently foolish.

Without going into further details, the only plausible suggestion against the complicity of the surviving brothers in the appropriation of this money is the opportunity Clib Barton had to take it, as he had the means of access to it. This suspicion is largely predicated of the assumption that he was seen at a late hour the night of the alleged burglary about the balcony of the storehouse. This assertion rests upon the merest hearsay testimony. No witness testified to having so seen him, but a witness was permitted, without objection, to say he was told that Clib Barton was wandering about drunk that night, and was seen about the place at a late hour. It is apparent why this incompetent statement was admitted unchallenged. The objecting creditors deemed it a circumstance bearing on the existence of a probable conspiracy between the brothers to surreptitiously extract and hide the money, while the surviving brothers were willing enough to save themselves by the imputation thus cast upon their dead brother, so long as the ignominy of it did not proceed from their own mouths. In a contention between living brothers and the dead one, the presumption would rather favor the innocence of the latter. Maudlin drunk as he was when he returned with the money, he turned the package over to William P. Barton, Jr., the bookkeeper, who thus became its custodian; and it is doubtful if Clib Barton, who continued in an intoxicated con-

dition from the time he returned home until the time of the alleged burglary, even knew where the money was placed by William P. Barton, Jr. The other brother did know that the money was placed in said desk. It is true that there was evidence tending to show that Clib Barton, after he returned from Little Rock, passed a $50 bill at a saloon; and, while it would not be a strained inference that this bill was a part of the money received for the cotton, there is no more reason for assuming that he extracted it after than before the delivery of the package to his brother.

There were other instances and circumstances in evidence of an inculpatory character against the conduct of the petitioners in connection with this money, which are not of sufficient importance to affect the conclusion reached by the District Judge. Giving to his conclusion that deference to which it is entitled, his action in denying the petitioners for discharge must be affirmed. It is accordingly so ordered.