## GRAFTON v. MEIKLEHAM.

(Circuit Court of Appeals, Fifth Circuit. October 29, 1917. Rehearing Denied December 15, 1917.)

No. 3048.

1. TIME ⬫10(9)—APPEAL—TIME OF PERFECTION.

Under Bankr. Act July 1, 1898, c. 541, § 31, 30 Stat. 554 (Comp. St. 1916, § 9615), providing that, whenever time is enumerated by days, the number of days shall be computed by excluding the first and including the last, unless the last day shall fall on Sunday or a holiday, in which event the day last included shall be the next day therefrom, which is not a Sunday or legal holiday, an appeal from an order granting a discharge on September 21st, allowed October 2d, is within time, where the day preceding October 2d was a Sunday, even though the appeal was not taken within 10 days.

2. APPEAL AND ERROR ⬫719(1)—ASSIGNMENTS OF ERROR—NECESSITY.

It is competent for the Circuit Court of Appeals to notice a plain error, in the absence of any assignment.

3. APPEAL AND ERROR ⬫628(2)—APPEAL—DISMISSAL.

Though the original citation for an appeal was returnable November 2d, and the appeal was not docketed, nor was the record filed until several months thereafter, it will not be dismissed under rule 16 (150 Fed. lxxix, 79 C. C. A. lxxix), though the time was not properly enlarged as prescribed by the rule, where the statement of the evidence was not completed and signed by the District Judge until the day before it was filed, and appellee, long after the time when the original citation was returnable, participated in the proceedings.

4. BANKRUPTCY ⬫407(3)—DISCHARGE—DENIAL.

Under Bankr. Act, § 14, subd. b (4) (Comp. St. 1916, § 9598), declaring that a bankrupt shall not be discharged, if at any time subsequent to the first day of the four months immediately preceding the filing of the petition he transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property with intent to hinder, delay, or defraud his creditors, a bankrupt must be denied a discharge where he transferred on the eve of bankruptcy moneys due him to one creditor, but his real and declared purpose was to hinder and delay his principal creditor and prevent her sharing therein.

5. BANKRUPTCY ⬫407(3)—DISCHARGE—DENIAL.

Under such section, a bankrupt must be denied a discharge, where on the eve of bankruptcy he made a transfer to one creditor, which reserved to him a secret benefit, and was made with intent to hinder, delay, or defraud other creditors.

6. BANKRUPTCY ⬫407(3)—DISCHARGE—DENIAL.

A fictitious transfer by a bankrupt with intent to prevent a creditor from participating in the property transferred, which is an offense under Bankr. Act, § 29 (Comp. St. 1916, § 9613), is ground for denying the discharge under section 14, subd. b (1).

7. BANKRUPTCY ⬫407(3)—DISCHARGE—SCHEDULE OF ASSETS.

A bankrupt, who received a large monthly salary, filed a petition about the middle of the month, but did not include in his schedule salary earned up to that time. His attorney had advised him that it was unnecessary to include such salary in the schedule, and that he would take the amount for fees. The bankrupt understood that it was to be a fee in the bankruptcy proceeding, but the attorney intended to apply a part on a claim arising out of previous litigation. While an assignment under the state laws was not valid unless in writing, the attorney did not have the same reduced to writing, and the bankrupt expressed himself

⬫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

246 F.—47

as indifferent to the fate of such assigned salary, unless a particular creditor participated therein. *Held* that, as the bankrupt collected the salary himself and made no payment thereof to his attorney or into the bankruptcy court until the question of his discharge arose, the transfer must be deemed one tending to hinder or defraud creditors, or to be a fictitious transfer, precluding discharge.

Appeal from the District Court of the United States for the Northern District of Georgia; William T. Newman, Judge.

In the matter of the bankruptcy of H. P. Meikleham. From an order of the District Court, granting the bankrupt a discharge (236 Fed. 401), Mrs. Virginia A. Grafton, the objecting creditor, appeals. Order reversed, and cause remanded, with directions.

R. A. Denny and J. E. Dean, both of Rome, Ga., for appellant.

Barry Wright, of Rome, Ga., for appellee.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This is an appeal by an objecting creditor from an order of the District Court, granting the appellee a discharge under the Bankruptcy Act of 1898. A motion to dismiss the appeal was submitted, at the time of the submission on the merits. The motion to dismiss was based on three grounds: (1) That the appeal was taken 11 days after the order of discharge was entered; (2) that the assignments of error, because of their vagueness, would not support the appeal; and (3) that the appeal was not docketed and the record filed within the 30 days at the expiration of which the appeal was returnable.

[1] 1. The appeal was allowed October 2, 1916, from a judgment entered September 21, 1916. It was therefore allowed on the eleventh day, and would have been too late but for the fact that the day preceding October 2, 1916, was Sunday. Section 31 of the act of 1898 is as follows:

"Whenever time is enumerated by days in this act, or in any proceeding in bankruptcy, the number of days shall be computed by excluding the first and including the last, unless the last fall on a Sunday or holiday, in which event, the day last included shall be the next day thereafter which is not a Sunday or legal holiday." Comp. St. 1916, § 9615.

The appeal was taken in time.

[2] 2. We think the first assignment of error is explicit enough to present the question as to whether the discharge was properly granted under the evidence in the record. It is competent for the court to notice a plain error in the absence of any assignment.

[3] 3. The appeal was not docketed, nor was the record filed until February 22, 1917. The original citation was returnable November 2, 1916. The settlement of the evidence in narrative form was entered upon soon after the allowance of the appeal, but was not completed and signed by the District Judge until February 1, 1917. The appellant seems to have been guilty of no fault in this respect. The appellee participated in the hearings in the District Court before the District Judge for the settlement of the case, long after the return day of the

original citation. Both parties and the District Judge appear to have acted under a misapprehension as to the return day of the citation, and as the appellant was prompt in docketing the case and filing the record after the settlement of the case was signed by the District Judge and filed on February 1, 1917, we do not think the appeal should be dismissed under rule 16 (150 Fed. lxxix, 79 C. C. A. lxxix) for that reason, though the time was not properly enlarged, as prescribed by that rule. The motion to dismiss is overruled.

[4] Coming to the merits, we find it necessary to consider only the ground for opposing the discharge, based on the failure to schedule the salary owing the bankrupt from his employer, and withheld from his trustee, until after objections to his discharge were filed.

The bankrupt was employed at and before the time of the filing of the petition as the agent for the Massachusetts Mills, at Lindale, Ga., at a salary of $10,000, payable monthly. At the time of the filing of the petition there was owing him on account of salary about $390. While the schedules of the bankrupt were being prepared for filing with his voluntary petition, the subject of this salary item and the duty of the bankrupt to schedule it as an asset was discussed with his attorney. It was in the mind of the bankrupt when he swore to his schedules. The bankrupt failed to schedule it as an asset. His reason for omitting it, as testified to by him, was that he understood that it was to be applied to the payment of the attorney fee for his attorney in the bankruptcy proceedings. His attorney, Mr. Barry Wright, testified that $100 of the amount only was agreed upon as the amount of his fee in the bankruptcy case, and the balance of $290 of it was transferred to him verbally in payment of fees owing to him and his associate in previous litigation for the bankrupt. The evidence of the bankrupt with reference to the omission of the salary from the schedule is as follows:

"I remember that the schedule in bankruptcy was prepared in Barry Wright's office one night, and that at that time I informed him that the mill owed me between $350 and $400 in salary on that month's account. Mr. Wright stated that there was no use in letting that go into the general smash-up; that he might as well have that money as attorney's fee in the bankruptcy case. I don't remember Mr. Wright's giving me any legal advice on the subject. He said something about he thought he would make it stick, or he didn't know whether he could make it stick, that he would try it, and asked me to transfer the money to him. I think he told me that, if there was any penalty attached, it would only be that I would have to pay the money back into the estate, or words to that effect. After my petition in bankruptcy was filed, Mr. Wright never asked me for this money, nor asked me to send it to him. I considered that as a debt to him. After telling Mr. Wright about my assets and liabilities, I did not examine the schedule. I don't think I even saw it. I left it all to Mr. Wright, and relied absolutely upon his legal advice. I told Mr. Wright about this asset that the mill owed me, this $400 or $390 prior to that time I signed the schedule—in fact, while it was being made out. I did not know whether it was listed in the schedule or not. I want to change that: I thought it was shown in the schedule. As soon as Mr. Wright called on me for the $290 I paid it to him."

The evidence of Barry Wright, his attorney, in reference to the same matter is as follows:

"I want to state that, when Capt. Meikleham employed me to file his petition for involuntary bankruptcy, he disclosed to me the fact that he had a part of

a month's salary earned; that it was at my suggestion and request that he agreed to prefer me and Mr. Eubanks to the extent of the salary earned, except $100, which it was agreed that he pay to me as a retainer in this proceeding; that he sat in my office while I wrote out the schedules from the information that he gave, and that he signed the schedule under my advice; that I advised Capt. Meikleham that the payment to me, or the agreement to pay me, was probably a preference, but that the only penalty attached to it was that I would be liable to return that money to the trustee if I had paid it out—if I had received it, I mean, and, if I had not received it, then the trustee could recover it instead of me. I did not inform Capt. Meikleham whether the transaction would be disclosed by the bankruptcy papers or not, and I stated to Capt. Meikleham that I didn't know whether any objection would be made to it or not, and mentioned the fact that Mr. Denny, who was opposing it, was my partner in other matters, and Mr. Ed Dean, another attorney, was a very close personal friend of mine, and that I thought for these reasons that possibly I could get away with that $250 or $300."

The evidence of the trustee, Graham Wright, with reference to the same matter, is as follows:

"I was present the night Mr. Meikleham's schedules were being made up. The salary question came up. I was sitting in the office, and I think there was some discussion of it. I don't remember what was said, other than Barry Wright suggested that he (Meikleham) might as well give him (Wright) the salary, let him have it; and he said that was all right with him, or words to that effect. I am not testifying as to the exact language, but that just as long as Mrs. Grafton didn't get any more than she had to get that it was all right with him; that is the sum total of it. There was no statement that that money wasn't to go to Barry Wright bona fide for a fee. I remember Barry Wright's saying something about his and Mr. Eubanks' fee; that Meikleham owed Mark Eubanks a fee for defending a case. I was a clerk in the law offices of Denny & Wright at that time, and Barry Wright was a member of that firm."

The evidence further showed that the amount of salary was payable December 1, 1914, and was collected by the bankrupt and spent by him, and that no part of the sum owing him for salary, when the petition was filed, was ever paid by him to his attorney, in satisfaction of either his fees in the bankruptcy case or for previous litigation, but was collected and disposed of by the bankrupt, just as if there had been no assignment of it and no bankruptcy proceedings pending. It was not until after objections had been filed to his discharge in the bankruptcy case that he paid the $100 fee in the bankruptcy case to his attorney and paid $290 to his trustee—not to his attorney—and then payment was made, not out of moneys due him when his petition was filed, but out of moneys subsequently earned by him, and which were not assets of the bankruptcy estate.

On the side of the bankrupt it is contended that there was no concealment of the salary earned as an asset of the bankrupt, and no fraudulent transfer of it, but at most it was partly a preferential payment to his attorney for services outside the bankruptcy case and partly the payment of a reasonable fee in the bankruptcy case, and so constituted no ground for denying the bankrupt his discharge. If the transaction bears this interpretation, the discharge was properly granted.

The objecting creditor contends: (1) That there was no bona fide transfer of the salary to the attorney, either to satisfy the fee in bank-

ruptcy or fees for previous services, but that it was a fictitious arrangement, not intended to be carried out, to excuse the bankrupt from listing the salary as an asset, and hence a concealment of his assets from his trustee in bankruptcy; or (2) that, if there was a verbal transfer of the debt owing him for salary to his attorney, it was not made for the purpose of preferring his attorney, but for the expressed purpose of hindering, delaying, and defrauding his principal creditor, and was also infected with a secret trust in his own favor, by which he was to be permitted to collect and spend the money when it was due as he saw fit.

We think that the declarations of the parties, the circumstances of the transaction, and the subsequent conduct of the bankrupt and his attorney with reference to the disposition of the salary bear out the contention of the objecting creditor. The bankrupt testifies that, when he informed his lawyer of the fact that salary was then due him, the lawyer replied "that there was no use letting that go into the general smash-up; that he might as well have that money as attorney's fee in the bankruptcy case"; that "he thought he would make it stick; that he would try it, and asked me to transfer the money to him." The witness Graham Wright, who afterwards became trustee, testified that Barry Wright suggested that the bankrupt might as well let him have the salary, and, in reply, the bankrupt said that "just so long as Mrs. Grafton didn't get any more than she had to get that it was all right with him." These declarations are to be considered with what was subsequently done by the bankrupt and his attorney with reference to the salary. Instead of the money being paid by the Massachusetts Mills to the attorney, or by the bankrupt after he had received it, the bankrupt collected the salary himself and spent the whole of it for his own account, no part being applied to his attorney's claims against him. The attorney acquiesced in this conduct of the bankrupt, and the record clearly shows collected his fees without reference to the assignment, and as if none had been made. When the bankrupt's application for a discharge was opposed, the bankrupt, with the consent of his attorney, if not by his advice, then first paid $290, in lieu of the money, covered by the alleged assignment and owing at the time his petition was filed, and which he had appropriated when he received it, not to his attorney, but to the trustee, recognizing that it was assets of the bankrupt estate. Though the law of Georgia required the assignment, to be valid, to be in writing, as the attorney must have known, no written transfer of the salary was executed. So little did this feature of the transaction interest the bankrupt and his attorney that their minds never met as to what the transaction was. The bankrupt testified that all the earned salary was to be applied to the fee of the attorney in the bankruptcy case, while the attorney testified that but $100 of it was to be so applied and the balance was to be applied to the payment of fees due the attorney and another for services rendered in other cases than the bankruptcy proceedings.

The bankrupt's principal creditor, who was his mother-in-law, was the Mrs. Grafton mentioned by him in his evidence, quoted above. She had obtained a judgment against him shortly before the petition was filed in a large sum, arising from a transaction in which the bank-

rupt had converted her securities, loaned to him, to his own use. It seems a fair inference that the voluntary petition was filed to defeat the collection of this judgment. The bankrupt had separated from his wife, and there was hostile feeling between himself and his mother-in-law. His purpose to keep any part of his assets from reaching her was outspoken, and it was to effectuate this purpose, evidently, that he failed to schedule his earned salary. Plainly, no purpose of compensating his attorney actuated him, on his own statements.

Though he transferred his earned salary to his lawyer to secure a debt he owed him, yet, if his real purpose in so doing was his declared purpose, viz. to hinder and delay his principal creditor in her right to have a part of the sum applied to her judgment, this would constitute a transfer of his property with intent to hinder, delay, or defraud his creditors, within the meaning of subdivision b (4) of section 14 of the Bankruptcy Act, and would prevent his discharge.

[5, 6] If the transfer was made with the secret understanding between the bankrupt and his attorney, either express or implied, that the bankrupt was to be permitted, in spite of the assignment, to collect and use the money covered by it as if it were his own, and the assignment was to be operative only to protect the bankrupt, in case this disposition of the earned salary or the failure to schedule it was brought in question by his creditors, then the reservation of this secret benefit to the bankrupt would render the transfer of the money one made "with intent to hinder, delay, or defraud his creditors," within the meaning of the same section of the Bankruptcy Act, and prevent his discharge.

If there was no real transfer, but the transaction was fictitious, with no better basis than to afford a pretext for not scheduling the earned salary as an asset, so that the bankrupt's mother-in-law might be kept from receiving any part of it, then this would be a concealment by the bankrupt of property belonging to the estate in bankruptcy from his trustee, which is an offense punishable by imprisonment under section 29 of the act, and a ground for denying him a discharge under subdivision b (1) of section 14 of the Bankruptcy Act. Only in the event the transaction was an actual one, and its only infirmity that it preferred the attorney over the bankrupt's other creditors, would it afford no ground for denying the bankrupt his discharge.

[7] In view of the declarations of the bankrupt and of his attorney in his presence, in view of the character of the assignment, and the fact that there was no meeting of the minds of the bankrupt and his attorney as to its terms—its admitted invalidity—and in view of the complete ignoring of it in the subsequent conduct of the bankrupt and his attorney, we have concluded that the transaction was more than a preferential one, and that it constituted either a transfer with intent to hinder, delay, or defraud creditors or a concealment of assets, and was a bar to the discharge of the bankrupt.

The other grounds of opposition are insufficient to deny the bankrupt his discharge, though they clearly show that the bankrupt was not actuated by that desire to surrender all his assets to his trustee, and to see them distributed among his creditors to the best advantage in reduction of their debts, which the act contemplates.

The order of the District Court, granting the bankrupt his discharge, is reversed, and the cause remanded to the District Court, with directions that an order be there entered, denying the bankrupt his discharge, and the appellee is taxed with the costs of appeal.