## FARMERS' SAVINGS BANK et al. v. ANTON.

(Circuit Court of Appeals, Eighth Circuit. August 4, 1924.)

No. 6211.

1. **Bankruptcy ⬤⟿407(3) — Mere preference does not defeat right to discharge.**

Act of one contemplating bankruptcy in giving mere preference to part of his creditors does not defeat bankrupt's right to discharge.

2. **Bankruptcy ⬤⟿407(3)—Circumstances stated under which preferential payments constitute fraudulent transfer, barring discharge.**

Where transfer of money or property is made by an insolvent debtor on the eve and in contemplation of bankruptcy, in pursuance of deliberately formed scheme to defraud his creditors generally, and method of carrying out fraudulent plan is to pay certain creditors in full, it falls within Bankruptcy Act, § 14b (4), being Comp. St. § 9598, and bars right to discharge.

3. **Bankruptcy ⬤⟿414(1) — Presumed that omission of property from schedules was intentional and fraudulent.**

Law presumes, if property which should have been included in schedules is omitted therefrom, that its omission was intentional and fraudulent, and for purpose of concealing it, with intent to hinder, delay, and defraud his creditors, and burden is cast on bankrupt to overcome that presumption by satisfactory explanation before he can obtain discharge.

4. **Bankruptcy ⬤⟿414(3)—Evidence held to show false oath by bankrupt, barring discharge.**

Evidence, on objections to discharge, held to compel conclusion that property omitted from schedules was intentionally and fraudulently omitted, and hence that bankrupt made false oath, constituting offense punishable by imprisonment, as provided in Bankruptcy Act, § 29b (3), being Comp. St. § 9613, barring his discharge under section 14b (1), being Comp. St. § 9598.

Appeal from the District Court of the United States for the Northern District of Iowa; George C. Scott, Judge.

In Bankruptcy. In the matter of the estate of Clyde C. Anton, bankrupt. From an order (283 Fed. 820) discharging the bankrupt, the Farmers' Savings Bank and others appeal. Reversed and remanded, with instructions.

A. B. Lovejoy and Mears & Lovejoy, all of Waterloo, Iowa (Sherman T. Mears, of Waterloo, Iowa, on the brief), for appellants.

J. S. Tuthill and Reed, Tuthill & Reed, all of Waterloo, Iowa (J. T. Sullivan, S. B. Reed, and Harry M. Reed, all of Waterloo, Iowa, on the brief), for appellee.

Before SANBORN and LEWIS, Circuit Judges, and McGEE, District Judge.

McGEE, District Judge. This, a bankruptcy proceeding, is here on appeal by objecting creditors from an order of the court below discharging the bankrupt.

Clyde C. Anton, 34 years of age, a farmer residing 3½ miles from Laporte City, Iowa, was on February 3, 1921, on his own petition adjudicated a bankrupt. The schedules as filed on the day last mentioned showed an indebtedness of $16,068.90, $790 of which was due for rentals of three farms which the bankrupt cultivated in the year 1920, and was secured by landlords' liens on the personal property of the bankrupt. The remaining $15,278.90, was wholly unsecured. Ten thousand dollars of that amount was owing to the Farmers' Savings Bank, $2,600 to the Union State Bank, and $400 to Richards & Richards, implement dealers, all of Laporte City, Iowa, and $650 to the Cramer Motor Works of Waterloo, Iowa, for an automobile. The property listed in schedule B, at the valuation placed thereon by the bankrupt, aggregated $5,494, from which the bankrupt claimed as exempt property valued at $3,413.50.

The first meeting of the creditors was held, the trustee was elected, and the first examination of the bankrupt took place on February 18, 1921. He was also examined by the creditors on the 25th of February, the 22d of June, and 21st of September, 1921. When examined on the various occasions mentioned, the bankrupt volunteered no information whatever in regard to his affairs

or property, and manifested a disposition to withhold all information that he possessed on the subject, but a searching examination by the attorneys for the creditors developed that he had omitted from his schedules property of the value of nearly $2,000.

On May 9, 1921, the bankrupt filed a petition praying that he have a full discharge from all debts provable against his estate under the Bankrupty Act, except such debts as are excepted by law from such discharge.

On July 12, 1921, the Farmers' Savings Bank, Union State Bank, and Richards & Richards, unsecured creditors to the extent of $13,000, filed four objections to the discharge of the bankrupt, as follows:

(1) That the bankrupt knowingly and fraudulently omitted 20 items of personal property from his schedules, the principal items being 400 bushels of oats, 1,750 bushels of corn, 15 tons of hay, 15 tons of straw, the proceeds of 12½ tons of hay in transit to St. Louis, and the proceeds of 3 hogs shipped to market by one Lamb, and in doing so (a) committed an offense punishable by imprisonment as provided in section 29b (1), chapter 4, of the Bankruptcy laws of the United States; (b) committed an offense punishable by imprisonment as provided in section 29b (2) of chapter 4, of the bankruptcy laws of the United States in this: that he knowingly and fraudulently made a false oath to schedule B, false because of the omission therefrom of the property above mentioned.

(2) That the bankrupt on January 26, 1921, (a) with intent to hinder, delay, and defraud his creditors, did sell and transfer to one Lloyd Lamb, of Laporte City, Iowa, a bunch of hogs, and received therefor $371.-12; that said sale and transfer were made by said bankrupt for the purpose of placing said hogs and the proceeds thereof beyond the reach of his creditors, and with that intent and purpose the said bankrupt did conceal the proceeds of said sale from his creditors; (b) that with like intent the bankrupt did on January 31, 1921, transfer to W. W. Smith the sum of $20, to Layman & Clock $18, to St. Clair & Franklin $33, and to D. M. King $120, said amounts being part of the proceeds of the sale of the hogs above mentioned.

(3) That the bankrupt on the 18th of February, 1921, while being examined under oath before the referee in bankruptcy in regard to the omission of a certain Great Western manure spreader from schedule B of his petition, knowingly and fraudulently gave false testimony and in five specified instances while so testifying on the 18th of February, 1921, the 25th of February, 1921, and the 22d of June, 1921, knowingly and fraudulently gave false testimony of and concerning his property and affairs then being inquired into by the creditors.

(4) That the bankrupt destroyed, concealed, and failed to keep books of account or records from which his financial condition might be ascertained.

On the 10th of October, 1921, the petition of the bankrupt for discharge, together with the creditors' objections thereto, were referred to a special master, and it was stipulated that all the testimony taken before the referee might be considered by the special master as though taken before him. On January 11, 1922, the special master made and filed his report, in which he overruled objections numbered 1, 3, and 4, sustained objection numbered 2, and recommended that a discharge be denied the bankrupt.

The objecting creditors filed exceptions to that part of the report of the special master which overruled their objections numbered 1, 3, and 4, and the bankrupt excepted to that part of the report which sustained the objections of the creditors to specifications 1 and 2 of objection No. 2, and recommended that a discharge be denied. The court overruled the exceptions of the objecting creditors, sustained the exception of the bankrupt, and ordered that a discharge be granted him. The objecting creditors have brought the case here by appeal and ask to have the above-specified rulings of the court below reviewed.

The appellants have filed 11 assignments of error. It will only be necessary to consider the first 3, any one of which, if sustained, will dispose of this appeal. It will tend to clearness to consider and dispose of the third assignment first. It appears from the testimony that the Farmers' Savings Bank of Laporte City, Iowa, of which Jesse Kober was president, was an unsecured creditor of the bankrupt to the extent of $10,000, and that as early at least as December, 1920, the bank was pressing the bankrupt for payment of, or security for, its claim. On the 29th of January, 1921, Kober went to the home of Anton, and the record indicates that he pressed vigorously for either payment of or security for the claim of his bank, and was not successful in obtaining either, but his efforts did produce a vindictive feeling on the part of Anton towards the bank, and apparently inspired a determination on his part to prevent the

bank, as far as he could do so, from realizing on its claim.

On the 26th of January, 1921, Anton sold 19 hogs to Lloyd Lamb, a stock dealer at Laporte City, Iowa, for $371.12, and on that day received Lamb's check therefor, drawn upon the First National Bank of Laporte City, a bank with which Anton had no business relations. He at once sent the check to his father, Nick Anton, at Waterloo, Iowa, with instructions to cash the same, and hold the proceeds for him. This, it will be noted, was five days before he filed his petition in bankruptcy. Anton's testimony, subsequently taken before the referee, as well as the testimony of his father and his brother, Herbert, makes it perfectly clear, and Anton so testified, and the special master so found, that his purpose in so disposing of the check and its proceeds was to prevent the Farmers' Savings Bank from receiving any part of it. In other words, the check and its proceeds were thus concealed for the purpose of defrauding a creditor holding two-thirds of Anton's unsecured indebtedness.

Anton subsequently testified before the referee that he concluded on the 29th day of January, 1921, to go through bankruptcy, and spent that day making a list of his property for use in preparing his petition and schedules, and that he took the list with him to Waterloo, Iowa, on the 31st day of January, 1921, employed a firm of attorneys, and had them prepare a petition in bankruptcy with its accompanying schedules. In the course of the preparation of the schedules, Anton disclosed to his attorneys the fact that he had the amount of the Lloyd Lamb check, that it was in the possession of his father, and sought their advice on the point as to whether he could, without incurring risk or getting into trouble, select certain of his creditors and use the money to pay their claims in full. He was advised that that course could be followed, and that he could use part of the money in paying them, the attorneys, for their services in preparing the petition and schedules and filing the same.

Anton concluded to follow the course suggested, but it was necessary to defer the execution of the petition in bankruptcy and schedules until the following morning, that he might have time to locate the favored creditors, and make the suggested disposition of the proceeds of the Lamb check. Until that or a similar disposition of the fund was made, Anton could not, with it omitted, verify his petition or schedules without committing a felony. During the night of January 31st, the creditors were located, their claims paid in full, and on the following morning the petition and schedules were signed and verified, and on February 3, 1921, they were filed. That the plan thus deliberately conceived and executed had for its purpose the perpetration of a fraud upon the Farmers' Savings Bank and other unsecured creditors we have not the slightest doubt.

[1] The special master found as a fact that such was the purpose and motive that induced the action taken by Anton in so disposing of the fund in question. The court below, differing from the special master on this point, concluded that the transaction amounted to an ordinary preference, and was unaffected by the fact that the motive that induced the act had its origin in actual fraud, and held that the latter factor present did not change the situation, did not bring the case within the provisions of section 14b (4) of the Bankruptcy Act (Comp. St. § 9598), nor militate against the bankrupt's right to a discharge. That the act of one contemplating bankruptcy in giving a mere preference to part of his creditors, unaffected by the element of actual fraud, does not defeat the bankrupt's right to a discharge, may be conceded, but that is not the case presented by the record before us.

[2] The discharge which the bankrupt seeks, and to which honest, but unfortunate, debtors are entitled under the Bankruptcy Act, is intended to relieve misfortune, but it must be misfortune coupled with absolute honesty. It is the reward which the law grants to the bankrupt who brings his entire property into court and lays it, without reservation, at the feet of his creditors. This much the law demands. Where it is evident that he is scheming to be relieved of his debts while holding property which should be applied to their payment, he is not entitled to consideration from the court of bankruptcy. In re Becker (D. C.) 106 Fed. 54.

In Barton Bros. v. Texas Produce Co., 136 Fed. 355, 357, 69 C. C. A. 181, 183, Judge Philips, speaking for this court said: "The spirit of the Bankrupt Act is commendable. Its purpose is to release the honest debtor from the burden of debts which he is unable to longer carry; to give freer play to his energies and enterprises, that he may thereafter be better able to support himself and those dependent upon his earnings, and thereby be in position to render a better service to the state and to society. This be-

neficent policy is conditioned always upon the bankrupt's full and complete surrender of all his unexempt property for the benefit of his creditors. He must be honest in this respect. He must neither conceal nor withhold knowingly anything from his creditors which they are entitled, under the law, to know or receive. Whenever the court is impressed with the belief, after due inquiry and examination, that in the main the bankrupt has intended and tried to comply with the law, he should be dealt with liberally on his petition for manumission from his debts. On the other hand, in order to obstruct gross abuses of the spirit of the Bankruptcy Act, that it may not aid the dishonest debtor in being acquitted of his honest debts, while withholding aught that he should surrender for the benefit of his creditors, it is the duty of the court to look into the heart of his transactions."

The same thought is expressed in Re Baudoine (D. C.) 96 Fed. 536, in which case it is said: "The Bankruptcy Act, however, cannot be construed so narrowly as to exclude any vested interest constituting an asset available to creditors, merely on the ground that this asset is not expressly enumerated in section 70. Other provisions of the Bankruptcy Act show that the act is designed to cover all the property and estate of the bankrupt and all assets that can in any manner be legally made available for the payment of his debts, and to distribute all those assets equally among his creditors. As an incident to this complete distribution of assets, it further provides for the bankrupt's discharge from his debts. A discharge in bankruptcy upon any other condition than the complete appropriation of every known asset legally available to creditors would be not only a glaring wrong to creditors but contrary to every conception of a just system of bankruptcy."

The conclusion we have reached on the question presented for decision by the third assignment of error is that where a transfer of money or property is made by an insolvent debtor on the eve and in contemplation of bankruptcy, in pursuance of a deliberately formed scheme to defraud his creditors generally, and the method of carrying out the fraudulent plan so formed is to pay certain creditors in full, it falls within the provisions of section 14b (4) of the Bankruptcy Act, and bars the right of the bankrupt to a discharge. We think this a fair construction of the statute in question, and one the effect of which cannot prove otherwise than wholesome.

The case of Grafton v. Meikleham (C. C. A. 5) 246 Fed. 737, 159 C. C. A. 39, and 246 U. S. 665, 38 Sup. Ct. 334, 62 L. Ed. 929, is the only case called to our attention in which the precise question under consideration was presented and decided. In that case there was a sharp dispute as to whether the real transaction was a transfer of the $290 salary to the attorneys in payment of a pre-existing indebtedness for legal services, thereby preferring them to the other creditors of the bankrupt, or whether, while taking that form, the real transaction involved a retention of the money by the bankrupt for his own use. The court expressed its views of the law from both angles of the case and, dealing with the preference feature, said:

"The evidence further showed that the amount of salary was payable December 1, 1914, and was collected by the bankrupt and spent by him, and that no part of the sum owing him for salary, when the petition was filed, was ever paid by him to his attorney, in satisfaction of either his fees in the bankruptcy case or for previous litigation, but was collected and disposed of by the bankrupt, just as if there had been no assignment of it and no bankruptcy proceedings pending. It was not until after objections had been filed to his discharge in the bankruptcy case that he paid the $100 fee in the bankruptcy case to his attorney and paid $290 to his trustee—not to his attorney— and then payment was made, not out of moneys due him when his petition was filed, but out of moneys subsequently earned by him, and which were not assets of the bankruptcy estate. On the side of the bankrupt it is contended that there was no concealment of the salary earned as an asset of the bankrupt, and no fraudulent transfer of it, but at most it was partly a preferential payment to his attorney for services outside the bankruptcy case, and partly the payment of a reasonable fee in the bankruptcy case, and so constituted no ground for denying the bankrupt his discharge. If the transaction bears this interpretation, the discharge was properly granted. The objecting creditor contends:  *  *  *  (2) That, if there was a verbal transfer of the debt owing him for salary to his attorney, it was not made for the purpose of preferring his attorney, but for the expressed purpose of hindering, delaying, and defrauding his principal creditor, and was also infected with a secret trust in his own favor, by which he was to be permitted to collect and spend the money when it was due as he saw fit.  *  *  *

"The bankrupt's principal creditor, who was his mother-in-law, was the Mrs. Grafton mentioned by him in his evidence, quoted above. She had obtained a judgment against him shortly before the petition was filed in a large sum, arising from a transaction in which the bankrupt had converted her securities, loaned to him, to his own use. It seems a fair inference that the voluntary petition was filed to defeat the collection of this judgment. The bankrupt had separated from his wife, and there was hostile feeling between himself and his mother-in-law. His purpose to keep any part of his assets from reaching her was outspoken, and it was to effectuate this purpose, evidently, that he failed to schedule his earned salary. Plainly, no purpose of compensating his attorney actuated him, on his own statements. *Though he transferred his earned salary to his lawyer to secure a debt he owed him, yet, if his real purpose in so doing was his declared purpose, viz. to hinder and delay his principal creditor in her right to have a part of the sum applied to her judgment, this would constitute a transfer of his property with intent to hinder, delay, or defraud his creditors, within the meaning of subdivision b (4) of section 14 of the Bankruptcy Act, and would prevent his discharge.*"

The exception of the bankrupt ought to have been overruled and a discharge denied him.

The first and second assignments of error properly should be considered together. The first assignment has to do with omissions from the schedules as originally filed of personal property valued by the bankrupt at over $1,500. The second assignment is predicated upon the proposition that the bankrupt having made the usual oaths to the petition and to schedule B, with the property above specified omitted therefrom, that the oaths so made were false, and therefore in making them he committed an offense punishable by imprisonment as provided in the Bankruptcy Act, and should be denied his discharge under the provisions of section 14b (1), which provides that a discharge shall be refused when it appears that the bankrupt "committed an offense punishable * * * as herein provided."

Section 29b, chapter 4, of the Bankruptcy Act (Comp. St. § 9613), so far as here applicable is as follows: "A person shall be punished, by imprisonment for a period not to exceed two years, upon conviction of the offense of having knowingly and fraudulently * * * made a false oath * * *

in, or in relation to, any proceeding in bankruptcy."

The special master found, and the court below approved the finding, that personal property, consisting of 400 bushels of oats, 1,750 bushels of corn, 15 tons of hay on the farm, 15 tons of straw, 12½ tons of hay in transit to St. Louis, a manure spreader, 6 hogs, and 1 cow, all of the value of $1,518.-98, was omitted by the bankrupt from his schedules as originally filed, and that his oath to schedule B was false, and in that connection the special master reported that he failed (which we construe to mean was unable) to find that the charge of fraudulent concealment was sustained by the evidence.

Section 14b (4) of the Bankruptcy Act provides that the bankrupt shall be discharged, unless he has at any time subsequent to the first day of the four months immediately preceding the filing of the petition transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property with intent to hinder, delay, or defraud his creditors. The contention of the objecting creditors is that the omission from the schedules of the property hereinbefore mentioned, aggregating in value more than $1,500, was for the purpose of concealing it with intent to hinder, delay, or defraud his creditors.

The filing of the petition in bankruptcy and the schedules, in legal effect, amounted to a solemn declaration and representation by the bankrupt to the bankruptcy court, the trustee, and the creditors that every statement contained therein was true, and that every item of property belonging to the bankrupt and which under the Bankruptcy Act should be listed therein, had been so listed. The act is of such a nature that its direct tendency is to disarm suspicion and halt investigation.

That this is true will become apparent when it is remembered that the bankrupt in verifying the petition, "makes solemn oath that the statements contained therein are *true according to his best knowledge, information, and belief;* * * * that the schedule hereto annexed, marked Exhibit B, and verified by your petitioner's oath, contains an accurate inventory of all his property both real and personal," and is "a statement of all his estate both real and personal in accordance with the acts of Congress relating to bankruptcy"; and that the bankrupt possessed no other "goods or personal property of *any other description.*"

[3] Because of the nature and tendency

of the acts and declarations mentioned, the law presumes, if property which should have been included in the schedules of a bankrupt is omitted therefrom, that its omission was intentional and fraudulent, and for the purpose of concealing the same with intent to hinder, delay and defraud his creditors. The burden is cast upon the bankrupt to overcome that presumption by a satisfactory explanation of the omissions before he can obtain a discharge from his debts. In re O'Gara (D. C.) 97 Fed. 932; In re Finkelstein (D. C.) 101 Fed. 418; In re Becker (D. C.) 106 Fed. 54; In re Royal (D. C.) 112 Fed. 135; In re Breitling (C. C. A. 7) 133 Fed. 146, 66 C. C. A. 212; Seigel v. Cartel (C. C. A. 8) 164 Fed. 691, 90 C. C. A. 512; In the Matter of Brincat (D. C.) 233 Fed. 811; Sinclair v. Butt (C. C. A. 8) 284 Fed. 568.

[4] It remains to be determined as to the omitted property whether the bankrupt has overcome the presumption stated by a satisfactory explanation of the omission of the same from the schedules. It appears without dispute, and is found as a fact by the special master, that on the 18th day of January, 1921, only two weeks before his petition in bankruptcy was filed, the bankrupt shipped from Waterloo, Iowa, to St. Louis, Mo., in the name of Eason Bros., dealers in hay and feed, 12½ tons of hay, from which returns were not had by Eason Bros. until the 18th of February, 1921; that in the interval Herbert Anton, brother of the bankrupt, and undoubtedly acting in behalf of the latter, both by 'phone and by personal visit interviewed Eason Bros., and sought information as to whether returns had been had for the hay. This item was omitted from the schedules as originally filed, as were the 2,150 bushels of grain, the hay and straw on the farm, the cow and 6 hogs, and the manure spreader, and we are asked—and expected to believe—that it all happened as the result of forgetfulness. As was stated in a somewhat similar case:

"It is incredible to suppose that he had forgotten such important documents and that the omission from the schedules was through inadvertence. * * * To find that he did not know of the existence of this interest is to assume that he was deficient in the most rudimentary mental processes. The fact that the amount was not then ascertained is immaterial, as it was his duty to schedule all his property. Bankruptcy Act, § 7a (8). That he failed to report these policies is conceded, that he did this knowingly cannot be successfully disputed, and

that he has since resisted the trustee in his efforts to realize upon the policies is established beyond question. The inevitable conclusion would seem to follow that the concealment was with the intent to prevent the property from reaching his creditors. The omission knowingly of property from the schedules and the verification thereof constitutes a false oath within the meaning of section 29b (2) of the act. In re Lewin, 4 Am. Bankr. R. 636, 103 Fed. 852; In re McNamara, 2 Am. Bankr. R. 566, 579; In re Lowenstein, 2 Am. Bankr. R. 193, 106 Fed. 51; In re Hirsh, 2 Am. Bankr. R. 715, 724, 96 Fed. 468; Coll. Bankr. (3d Ed.) 167; In re Alderson, 3 Nat. Bankr. News & R. 189, 98 Fed. 588." In re Becker (D. C.) 106 Fed. 54.

The report of the special master states that the bankrupt discovered the omission of a large part of the omitted property the next morning after the schedules were filed, and accepts that as a truthful statement as to why the property was not included in the schedule, but overlooks the other explanations of the omissions absolutely destructive of the first one to which we have just referred. The second explanation, made under the pressure of a severe cross-examination by attorneys for the creditors, necessarily admits that the first explanation, that of forgetfulness, was false, and was that he omitted to schedule a large part of the property, the grain valued at $907.50, because he could find no item in the schedule under which grain could be properly listed.

This inability to find an appropriate place in the schedule for the grain occurred in the office of the attorney while the schedules were being prepared, and a simple inquiry addressed to his attorney then present would have furnished him the desired information as to the proper place for the insertion of the items about which he would have it understood his mind was puzzled, but he admits, not only that he did not make such inquiry, but also that he did not disclose to his attorney that the omitted property existed, and, when pressed for an explanation of this omission on his part, he considered it apparently a sufficient and satisfactory answer to say that he did not impart that information to his attorney because he had not asked him about it.

When his attention was called to "item M" of schedule B (2), which is intended as an all-inclusive dragnet question, viz. "Goods or personal property of any other description, with the place where each is situated," and to which he answered, "None,"

he made explanation No. 3, which was also destructive of explanation No. 1, and showed that the knowledge of the existence of the property was present in his mind at that moment. Explanation No. 3 was that the item M did not call for grain; that the words "personal property of any other description" was not intended, in his opinion, to cover grain; that grain, in his opinion, was not personal property—that it was only grain.

Comment can hardly be necessary, coming, as the testimony did, not from a child, but from a man 34 years of age, with intelligence, energy, and ability sufficient to operate three different farms at the same time, as well as a farm tractor and an automobile, with their internal combustion gas engines and complicated machinery, and with an ear for music that explains his possession of an expensive Victrola, and with sufficient standing in his community to obtain credit on his unsecured notes of $10,000 at one bank and $2,600 at another.

When under examination by the creditors, the bankrupt, after reluctantly disclosing the existence of a large part of the omitted property, reached the point where he answered that he could not think of any other property than that disclosed. Counsel for the creditors then propounded the following question:

"Q. Now, as I understand you, there is no further property other than what you have listed in your petition and to what you have testified to that you own. Have you no personal claim against other people? Anything that would constitute an asset?"

Before the bankrupt could answer the question, and apparently doubting his truthfulness and honesty, his attorney interposed with the following statement:

"Mr. Tuthill: This question calls for anything of any kind or character which you might own, whether we have it in this list as an asset or not. If there is anything you own, it is your duty to tell it now."

Promptly, and without any apparent hesitation, after being thus cautioned by his attorney, the bankrupt continued:

"I had one more cow than what you had on the paper when I got home and counted it up. There was also three hogs more. I have a manure spreader, bought from Richards & Richards, on the farm, but I did not list it, because I did not think about it."

These items were valued by the bankrupt as follows:

| | |
|---|---:|
| Manure spreader | $ 60.00 |
| Hogs | 70.00 |
| Cow | 50.00 |
| | $180.00 |

The record contains many other instances, of which the above may be taken as typical, but which the limitations of an opinion forbid reproducing here.

It is morally certain that, until cautioned by his attorney that it was his duty to "tell it now," the bankrupt, while he had in mind the existence of the property last mentioned, had no intention of disclosing the same. The bankrupt was neither frank nor candid in his testimony given at the various hearings before the referee and special master, and it is apparent that at no stage of the bankruptcy proceedings did he intend in good faith to comply with the requirements of the Bankruptcy Act and surrender all of his unexempt property for the benefit of his creditors.

We have read and most carefully considered the testimony contained in the record, and in our opinion it not only warrants, but compels, the conclusion that the bankrupt, within four months immediately preceding the filing of his petition and schedules in bankruptcy, knowingly and fraudulently transferred and concealed the property which it is found he omitted from his schedules, with intent to hinder, delay, and defraud his creditors, and in making a false oath to schedule B committed an offense punishable by imprisonment as provided in section 29b, subdivision 3, of the Bankruptcy Act; that is, he knowingly and fraudulently made a false oath with relation to a proceeding in bankruptcy. Our conclusion is that the first, second, and third assignments of error are well taken.

The order appealed from is reversed, and the case is remanded to the court below, with instructions to enter an order denying the bankrupt a discharge.