## In re SHUTE.

### NEALON et al. v. SHUTE.
### No. 5949.

Circuit Court of Appeals, Ninth Circuit.
March 3, 1930.

Thomas W. Nealon and Alice M. Birdsall, both of Phœnix, Ariz. (Willis N. Birdsall, of Santa Fé, N. M., on the brief), for appellants.

Orme Lewis, James R. Moore, and Moore, Elliott & Shimmel, all of Phœnix, Ariz., for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge.

This is an appeal from an order granting a discharge in bankruptcy to George W. Shute, who was adjudged a voluntary bankrupt on April 17, 1928. The petition for discharge was filed May 29, 1928, and in due time the trustee, who had been authorized so to do, together with the largest creditor, appeared and filed specifications of objections thereto. After extended hearings thereon, the court below on January 9, 1929, denied the objections and entered the order of discharge.

The bankrupt is an attorney of more than twenty-five years' experience, and at the time of the adjudication resided at Phœnix, Ariz., where he was engaged in the practice of law; and it may be added from such practice he was receiving a substantial income. His obligation to the objecting creditor grew out of a transaction wherein the latter as his surety signed his promissory note to a bank. The bankrupt having defaulted, the creditor was required to take up the note at an outlay of $31,332, the last installment of which was paid to the bank in June, 1927. To procure reimbursement, the creditor placed the matter in the hands of an attorney. By the latter efforts were thereafter made, without success, to induce Shute to make at least small payments on account; and fruitless, too, was a letter written on November 23, 1927, threatening suit unless Shute took advantage of an offer of the creditor to accept a small part of the amount due in full settlement of the claim. Failing to get him to do anything, early in April, 1928, the creditor commenced suit in one of the state courts, and ten days later Shute filed his petition in bankruptcy. In the verified schedules accompanying his petition, he listed as exempt his law library

and household effects valued at $1,025, and as assets subject to distribution to his creditors, a bank deposit of $15.67, real estate valued at $250, which, however, was subject to a tax lien of $45, and some apparently worthless shares of mining stock.

Under the objection that the bankrupt had knowingly and fraudulently omitted from the schedules and concealed property belonging to the estate, the trustee specified nine items, aggregating $26,350. In view of the defense that, though the schedules were, in some respects, untrue, the bankrupt had acted in good faith, and that the transactions involved were in fact not always what upon their face they seemed to be, the evidence took a wide range, and as a whole the record is extraordinarily voluminous. It will therefore be impracticable to review all the items, and we select for discussion those which may most readily be stated, and which, if not fully typical of all, are sufficiently representative.

First, a life insurance policy.—The prescribed form of schedules, which was used in this case, contains various headings for the listing of assets. One of these, "Policies Of Insurance," contemplates a listing in the blank space therefor policies held by the bankrupt. In Shute's schedules there was written in such blank space the word "None." At the time the schedules were prepared and verified, he was carrying a policy of life insurance written in 1924, for $10,000, which was in his safe in his office where he prepared the schedules; and it then had an accrued or cash-in value of $746.85. As a matter of law, to this amount it was an asset of the bankrupt estate subject to distribution to creditors. Cohn v. Malone, 248 U. S. 450, 39 S. Ct. 141, 63 L. Ed. 352. All this the bankrupt now admits. His defense is, not that he had forgotten he had the policy or inadvertently failed to list it, but that he was of the belief it had no cash value because of some statements the agent who wrote it made to him at the time it was issued. In our opinion, as is plainly implied by the form of the schedule, it is the duty of a bankrupt to list all his policies in order that, with the information thus afforded, the trustee, and ultimately the court, can consider them and determine whether to any extent they constitute assets. In re Gailey (C. C. A.) 127 F. 538. But were the view to be taken that he is bound to schedule only such policies as constitute assets, Shute's conduct would be indefensible. If he was going to take the responsibility of determining that question, it was manifestly his duty to make reasonable

investigation. This he did not do; indeed, he says he never read the policy. Having it in his hands, he could not refrain from reading it and with impunity make a false return in respect thereof. He was a lawyer of experience, and admittedly he could in a few minutes have informed himself of its real character. It is of the highest importance in the disposition of a bankrupt's estate that by the schedules the court and its officers be truly and fully advised of the facts; this Shute, as a lawyer, should have fully realized. If intelligent bankrupts can be relieved of the consequences of false statements in these returns for reasons such as are here offered, the fear of a denial of a discharge would constitute no deterrent to concealment and falsity. Here, as elsewhere, if one to his own advantage and in careless disregard of the rights of others recklessly asserts to be true that which by use of means at hand he could easily learn to be untrue, he is chargeable with fraud. And, furthermore, as was said by the Circuit Court of Appeals of the Eighth Circuit in Farmers' Savings Bank v. Anton, 1 F.(2d) 103, 107: "Because of the nature and tendency of the acts and declarations mentioned, the law presumes, if property which should have been included in the schedules of a bankrupt is omitted therefrom, that its omission was intentional and fraudulent, and for the purpose of concealing the same with intent to hinder, delay and defraud his creditors. The burden is cast upon the bankrupt to overcome that presumption by a satisfactory explanation of the omissions before he can obtain a discharge from his debts. In re O'Gara (D. C.) 97 F. 932; In re Finkelstein (D. C.) 101 F. 418; In re Becker (D. C.) 106 F. 54; In re Royal (D. C.) 112 F. 135; In re Breitling (C. C. A. 7) 133 F. 146, 66 C. C. A. 212; Seigel v. Cartel (C. C. A. 8) 164 F. 691, 90 C. C. A. 512; In the Matter of Brincat (D. C.) 233 F. 811; Sinclair v. Butt (C. C. A. 8) 284 F. 568." And see, also, our discussion in Heilbronner v. Dinkelspiel, 20 F.(2d) 93. Clearly, we think, the bankrupt has failed to overcome this presumption.

The Hudson automobile.—Touching this item the evidence goes further, and strongly tends to show that the withholding of it from the schedules was in pursuance of a deliberate plan to defeat the just claim of his creditor. Early in October, 1927, Shute purchased the automobile from a local dealer. The regular price was $1,765, but, owing to certain transactions had theretofore, it was sold to him for $1,535. Upon the day of the purchase, the dealer's books show, he was credited with $1,185, on the next day, October 7th, with $100, and on November 26th with $250. Upon November 25th, which was the date borne by the check for this last item, he and the dealer ostensibly entered into a conditional sale contract purporting to cover the sale of the car to him, and reciting that there was due thereon the sum of $1,500, payable on November 25, 1928. The instrument was filed for public record November 26, 1927. It will be noted that this transaction occurred only two or three days after the attorney for the creditor had written, threatening suit unless he accepted a stated proposition of settlement. The exact date is not shown, but apparently about the time the bankruptcy proceeding was commenced, probably shortly prior thereto, Shute drove the car back to the dealer's place of business, told him that he was having "some legal procedure," and, with the latter's consent, left the car in his basement. In the face of the fact that admittedly the dealer did not ask for the conditional sale contract and his books show that at the time there was not to exceed $15 due on the purchase price of the car, Shute now asserts that he executed the contract in good faith, believing that the major part of the price of the car was still owing to the dealer. As bearing upon that contention, we find that on April 7th, only ten days before he filed his petition in bankruptcy, he borrowed from a local bank $750, and, without request of the bank therefor, he insisted upon giving to it a chattel mortgage upon this car. In this mortgage he declared that the car "is hereby warranted to be the property of the said mortgagor, in his possession, and free from all prior liens, claims, and encumberances whatsoever." This he acknowledged and verified by his oath, as is required for chattel mortgages by the laws of Arizona. Of this mortgage and indebtedness he made no mention in the schedules he filed with his petition. Not even plausible do we find the attempted explanation of these facts, which were either ultimately admitted or indubitably established by witnesses who, to say the least, were not unfriendly to the bankrupt.

We refer to the other items specified only in a general way. The phonograph, the Essex automobile, and the savings account involved alleged gifts by the bankrupt to his wife while admittedly he was insolvent. If we assume that the value thereof is recoverable by the trustee, it may still be that the failure to schedule them can be reconciled with the theory of innocent intent, though it must be conceded that the savings account and the Essex car transactions exhibit fea-

tures which commonly characterize efforts upon the part of insolvent husbands thus to hinder and defraud their creditors.

We have also thought it unnecessary for the purposes of this proceeding to consider fully the Globe real estate, which, upon a record disclosing striking inconsistencies, the bankrupt contends is his wife's separate property.

As to the Goswick transaction, under which the trustee contends there was due the bankrupt at the time he filed his schedules $16,500 as a balance of an original obligation of $20,000 as commissions for the sale of mining property, we are wholly unable to accept the bankrupt's explanation. After investigation under many difficulties, the trustee was able to show that Shute from this source received $1,000 during the year 1927, $2,000 either late in December, 1927, or early in 1928, and $8,000 on June 8, 1928. In the face of circumstances tending strongly to show that the three items were paid to him in discharge of a legal obligation relating back to a date long before the institution of the bankruptcy proceedings, Shute's attempted explanation, and his only explanation, is that he received the sums as gifts. In his verified income tax return for 1927 he reported the $1,000 as "Wesley Goswick Commission," but, as in the case of the insurance policy, he now thinks he did not read the return; and he suggests that the clerk who prepared it, with no information other than that received from him, so characterized the item fancifully and without authority.

Nor do we find satisfactory the attempted explanation of the La Prada item of $250 and the Wentworth item of $995.

Reversed, with directions to enter an order denying the petition for discharge.