**In re William Larry HARRILL dba Larry Harrill Insurance Agency, Bankrupt.**

**COTTON BELT INSURANCE CO., INC., Plaintiff,**

v.

**William Larry HARRILL and William Larry Harrill dba Larry Harrill Insurance Agency, Defendant.**

**MEMPHIS FIRE INSURANCE COMPANY, Plaintiff,**

v.

**William Larry HARRILL dba Harrill Insurance Agency, Defendant.**

**Bankruptcy No. BK–3–79–13.**

United States Bankruptcy Court, E. D. Tennessee.

Sept. 18, 1979.

---

Sharon J. Bell, Knoxville, Tenn., for defendant.

Charles D. Deas, Marysville, Tenn., for plaintiff, Cotton Belt Insurance Co.

Wayne Christeson, Jr., Knoxville, Tenn., for plaintiff, Memphis Fire Insurance Co.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

### I

Cotton Belt Insurance Co., Inc. (Cotton Belt) and Memphis Fire Insurance Company (Memphis Fire) filed complaints seeking a determination that defendant's debts to them are nondischargeable. In separate actions plaintiffs allege nondischargeability under § 17a(2) and § 17a(4) of the Bankruptcy Act (11 U.S.C. § 35a(2) and (4)).[1]

*Cotton Belt*

The bankrupt was an insurance agent of Cotton Belt and as such was authorized to bind and execute insurance contracts and collect and receipt for premiums for business placed with that company. The bankrupt also was authorized to retain the commissions due him out of the premiums collected and to transmit the balance to Cotton Belt.

The bankrupt and Cotton Belt operated under the terms of a written Agency-Company Agreement executed June 1, 1975. The pertinent part of the Agreement states that the agent (the bankrupt) is an independent contractor and not an employee of the company. Further, that he is authorized to solicit, receive and transmit to the company proposals for insurance contracts, to bind and execute insurance contracts, to provide the usual and customary services of an insurance agency; and to collect and receipt for premiums and, as full compensation, to retain commissions out of the premiums so collected.

Part II of the Agreement entitled "Premium Accounting," provides that the agent (the bankrupt) is to prepare monthly itemized statements and to remit the balance

---

1. "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false representations . . . or for willful and malicious conversion of the property of another; . . . (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity." § 17a(2) and (4), Bankruptcy Act.

shown in the statement due the company not later than 45 days after the end of the account month.

Although the bankrupt commenced writing policies in June 1975, he remitted no premiums to Cotton Belt during the months of July, August, and September 1975. On October 10, 1975, a $629.27 payment was made to Cotton Belt on a balance owing of $2,576.03.

On January 15, 1976, a $75.00 payment was sent to Cotton Belt through the bankrupt's attorney. At that time the bankrupt owed Cotton Belt the sum of $4,339.13.

Additional payments made either directly by the bankrupt or through his attorney in January, March, April and June 1976, totaled $351.00. After the last payment on June 22, 1976, the bankrupt owed Cotton States $5,305.04, after all credits and commissions had been deducted.

On June 20, 1977, Cotton Belt obtained judgment against the bankrupt in the Circuit Court for Blount County, Tennessee, in the amount of $5,305.04. The judgment provides that the bankrupt would pay the sum in twelve monthly installments of $100.00 per month beginning July 1, 1977, and thereafter in 23 monthly installments of $200.00.

The balance owing on the judgment at this time is $4,705.04, and it is this sum that Cotton Belt says is nondischargeable in bankruptcy.

*Memphis Fire*

Between January 1977 and January 1978 the bankrupt acted as agent for the sale of insurance policies and the collection and remittance of insurance premiums for Memphis Fire.

Under the Agency Agreement entered into by the parties on December 6, 1976, Memphis Fire granted authority to the agent (bankrupt) to receive and accept proposals for contracts of insurance covering risks located in Tennessee and to write insurance business in accordance with the terms and conditions set out in the Agreement. The agent was authorized to collect, receive, and receipt for premiums on insurance and to retain out of the premiums so collected, as full compensation for all business placed with the company, commissions at rates mutually agreed upon. Accounts of money due the company were to be rendered monthly and the balance due was to be paid not later than 45 days after the end of the month for which the account was rendered.

The initial Agency Agreement dated December 6, 1976, is between Memphis Fire and Tennessee Valley Insuror, Inc., but an amendment to the Agreement effective February 1, 1977, changed the "agent" to Larry Harrill.

In a period of about nine months, between January 1977 and September 1977, the bankrupt became indebted to Memphis Fire in the amount of $5,705.60, after all commissions owing and all credits had been given. On May 19, 1978, the bankrupt executed a note in this amount with a payment schedule of $50.00 per month. No payments were subsequently made and it is this amount that Memphis Fire asserts is nondischargeable.

The bankrupt is 38 years of age. He worked for a short period of time as an insurance agent before opening his own agency in Maryville, Tennessee, in October 1974. He encountered financial difficulties almost immediately. He kept his own books for a period of time but later employed a clerk. He never had more than two other employees. His wife helped out when he could not afford to employ anyone else. At one time he sought help from an insurance agent in an adjoining city. In November 1975 he ran an ad in a newspaper in an effort to sell the agency but received no offers. In the latter part of 1976 he sought advice from an attorney concerning the debts owing Cotton Belt and Memphis Fire. He closed the insurance agency in January 1978 and is presently working as an assistant service manager for an automobile agency. He suffers from a brain tumor and requires medical treatment.

## II

The debts are dischargeable in bankruptcy.

The purpose of a discharge is set forth in the often quoted decision of *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) where the Court stated:

"One of the primary purposes of the bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.' *Williams v. U. S. Fidelity & G. Co.,* 236 U.S. 549, 554, 555, 35 S.Ct. 289, 290, 59 L.Ed. 713. This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. *Stellwagen v. Clum,* 245 U.S. 605, 617, 38 S.Ct. 215, 62 L.Ed. 507; *Hanover National Bank v. Moyses,* [186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113] *supra; Swarts [8] v. Fourth National Bank* (C.C.A.) 117 F. 1, 3; *United States v. Hammond* (C.C.A.) 104 F. 862, 863; *Barton Bros. v. Texas Produce Co.* (C.C.A.) 136 F. 355, 357; *Gilbert F. Shouse* (C.C.A.) 61 F.2d 398. The various provisions of the Bankruptcy Act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act. Local rules subversive of that result cannot be accepted as controlling the action of a federal court."

§ 17a of the Act provides that "[a] discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for . . . willful and malicious conversion of the property of another; . . . (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity . . ." (11 U.S.C. § 35a(2)(4)).

The term "fiduciary capacity" was first used in the Bankruptcy Act of 1841, in a phrase describing those "defalcations" which would not be discharged, 5 Stat. 441 (1841). The subsection also gave several examples of trustees whose debt would not be discharged if the debt was created by a "defalcation" while acting in such trustee capacity. In the case of *Chapman v. Forsyth,* 2 How. 202, 11 L.Ed. 236 (1844), the court early had the opportunity to determine the meaning of "fiduciary capacity," and held that the term applied only to express or technical trusts, not implied trusts. The court supposedly based its reasoning on the fact that several technical trusts were specifically mentioned in the statute, thus "any other fiduciary capacity" was intended to indicate those situations of a similar character to those specifically enumerated. See 41 Wisc.L.R. 239, 243.

The rationale for the court's holding is clearly expressed:

"If the Act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first Section of the Act" at page 207.

See also *Hennequin v. Clews,* 111 U.S. 676, 4 S.Ct. 576, 28 L.Ed. 565 (1884); *Palmer v. Hussey,* 119 U.S. 96, 7 S.Ct. 158, 30 L.Ed. 362 (1886); *Nobel v. Hammond,* 129 U.S. 65, 9 S.Ct. 235, 32 L.Ed. 621 (1889).

The Act of 1867 changed the wording of the subsection to read:

"[N]o debt created by the fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while

acting in any fiduciary character, shall be discharged." 14 Stat. 533 (1867).

As a result of this alteration, a minority of cases concluded that the subsection was in broader terms, and therefore included implied as well as technical trusts. The great majority of the cases, however, continued to strictly adhere to the *Forsyth* rule that "fiduciary capacity" applied only to technical or express trusts and that the Act of 1867 should receive the same interpretation as the 1841 Act.

In *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891), the Supreme Court stated that the use of word "trust" in an instrument does not make the relationship a fiduciary one within the meaning of the exception, where the legal effect of the instrument is not to create a fiduciary capacity.

■ The Act of 1898 contains Subsection 17a(4) in its present form and this subsection has been given the same interpretation as the 1867 Act; that is, the term "fiduciary capacity" applies only to express trusts, not brokers, factors, commission merchants, or agents.[2]

Concerning the meaning of "fiduciary capacity," Remington on Bankruptcy, Vol. 8, § 3364 at p. 249, cites the Supreme Court case of *Davis v. Aetna Acceptance Co.*:

"*Davis v. Aetna Acceptance Co.* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393, 26 ABR NS 577 (1934): 'The meaning of these words ["fiduciary capacity"] has been fixed by judicial construction for very nearly a century. *Chapman v. Forsyth*, 2 How. 202, 11 L.Ed. 236, decided in 1844 is a decision to the effect that within the meaning of a like provision in the Act of 1841, a factor does not act in a fiduciary capacity; the statute "speaks of technical trusts, and not those which the law implies from the contract." The scope of the exception was to be limited accord-

ingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity [citing cases]. It is not enough that by the very act of wrongdoing out of which the contested debt arose the bankrupt has become chargeable 'as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto. In the words of Blatchford, J., "The language would seem to apply only to a debt, created by a person who was already a fiduciary when the debt was created" [citing case].' "

Professor Countryman agrees:

." . . (I)n a line of decisions defining the meaning of the term used in the Bankruptcy Acts of 1841 and 1867, the Supreme Court has construed 'fiduciary' to be confined to trustees under 'technical trusts, and not those which the law implies from contract,' so that the exception does not apply to factors who convert the proceeds of their sales, creditors who convert pledged securities, brokers who convert bonds entrusted to them for collection, collection agents who convert their collections, and debtors who convert collateral which they hold under trust receipts. [Citations omitted]." "The New Dischargeability Law," Countryman, 45 Am.Bankr.L.J. 1, at pp. 16, 17.

Thus the term "fiduciary capacity" as used in present § 17a(4) has consistently, since its appearance in the Act of 1841, been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio*, that may be imposed because of the very act of wrongdoing out of which the contested debt arose. Thus, unless there is some additional fact, § 17a(4) does not apply to frauds of agents, bailees, brokers, factors, partners, and other persons similarly situated. Collier on Bankruptcy, Vol. 1A, § 17.24[4].

---

**2.** *In re Butts*, 120 F. 966 (N.D.N.Y.1903), where a purchase agreement was couched in terms of trust; *In re Wenham*, 153 F. 910 (S.D.N.Y. 1906), holding a railroad ticket agent was not a fiduciary so as to bar discharge of a debt arising out of his misappropriation of proceeds from the sale of tickets; *Swift & Co. v. Bullard*

*& Son*, 3 F.2d 814 (N.D.Ga.1925), involving a commission merchant; *In re Harber*, 9 F.2d 551 (2d Cir. 1925), corporate mismanagement; *In re Burchfield*, 31 F.2d 118 (W.D.N.Y.1929), an agent; *Bloomingdale v. Dreher*, 31 F.2d 93 (3rd Cir. 1929), a trust receipt relationship.

The word "fiduciary" does not cover all agencies. The reference is primarily to technical or express trusts, rather than to implied ones. A debtor-creditor relationship is not within the intendment, even though it involves the reposing of trust and confidence, as, otherwise, a discharge in bankruptcy would have but little value. Remington on Bankruptcy, Vol. 8, § 3364.

The bankrupt operated his own agency. He was personally responsible for his rent, salaries of employees, and other office expenses. By virtue of his agency agreements with plaintiffs and others, he was authorized to issue policies and collect the required premiums. He was not required to segregate the premiums received or deposit them in a special account. He prepared monthly itemized statements and according to the terms of the agreements was supposed to remit to the companies not more than 45 days after the end of the account month.

The funds received by the bankrupt were deposited in a general account. At one time the account may have carried the designation "escrow account", but this was soon dropped. The bankrupt paid both personal and business debts from the account. See Ex. 7. His personal withdrawals, primarily for living expenses, exceeded the commissions earned on the policies written. As a result, there were insufficient funds at the end of the accounting period to pay the companies.

The exhibits introduced by Memphis Fire indicate that insurance premiums totaling $112,831.85 were collected by the bankrupt on behalf of all the companies he represented between March 1, 1977 and February 1, 1978. Assuming a twenty percent (20%) equity in these funds, the bankrupt's allowable commission would be $22,-566.35. However, an examination of the check ledgers covering this period reflect that the bankrupt wrote $27,252.88 in checks for business or personal purposes. Personal expenditures included rent, groceries, clothing, utilities, insurance, medical, gasoline, automobile repairs and loan company repayments. The bankrupt knew that his personal and business expenditures were exceeding the commissions he was accruing but this fact does not turn the insurance company debts into the fraud, embezzlement, misappropriation or defalcation while acting in a fiduciary capacity, contemplated by Sec. 17a(4) of the Bankruptcy Act. From its inception, the bankrupt was struggling to create a viable business. He was unsuccessful and incurred debts that he is unable to pay. He is entitled to a discharge from those debts.

*Matter of Titus*, (E.Dist.Mich.) 2 Bankr. Ct.Dec. 554, involved an insurance subagent. An agreement authorized the subagent to issue policies and collect the required premiums. The bankrupt was not required to segregate premiums or to deposit them in a special account. After bankruptcy, the general agent alleged nondischargeability under Sec. 17a(4) and Michigan Code Sec. 500.1207(1) which apparently designates an insurance agent as a fiduciary. In a well-reasoned opinion, Judge Brody held the debt dischargeable:

"Clearly, except for Hallmark's reliance on M.C.L.A. Sec. 500.1207(1) its debt would be dischargeable in light of the Supreme Court's construction of the term 'fiduciary' as used in Section 17a(4). Nor is the character of the debt transformed by virtue of M.C.L.A. Sec. 500.1207(1). Congress [5] in enacting the Bankruptcy Act intended that an honest debtor be accorded an opportunity for economic rehabilitation by freeing him 'from the obligation and responsibilities consequent upon business misfortune'. *Local Loan Co. v. Hunt* 292 U.S. 234 [54 S.Ct. 695, 78 L.Ed. 1230] (1934). It would be anomolous indeed if states were to be permitted to thwart a fundamental purpose that the Bankruptcy Act was designed to accomplish by legislatively enlarging the area of excepted liabilities as enacted by Congress and construed by the Supreme Court of the United States. cf. *Wayne Creamery v. Clements* 14 Mich.App. 50 [165 N.W.2d 508] (1968)."

Nor do the debts owing to plaintiffs meet the test of non-dischargeability under Sec.

17a(2) of the Act as debts created for obtaining money by false pretenses or false representations, or for willful and malicious conversion of the property of another. See generally Vol. 1A Collier on Bankruptcy, Sec. 17.16, 17.17.

This Memorandum constitutes Findings of Fact and Conclusions of Law, Bankruptcy Rule 752.