CUMMINGS, Chief Judge.
This is an appeal from an order of a three-judge bankruptcy court that relied on 11 U.S.C. § 522(f)(2)(A) to discharge Thorp Finance Corporation’s nonpossessory, non-purchase-money security interest in various household goods owned by Mr. and Mrs. Gifford. Thorp’s security interest attached to the household goods one month before Section 522(f) of the Bankruptcy Reform Act of 1978 was enacted, raising the issues of whether Section 522(f) applies to Thorp’s security interest and if so whether that application is constitutional.
We first heard arguments on September 21, 1981, and on January 21, 1982, a majority of the hearing panel decided that Section 522(f) did not apply to Thorp’s pre-enactment security interest because such application “would give rise to * * * serious constitutional questions under the Fifth Amendment.” 669 F.2d 468, 470 (7th Cir.). Following a rehearing of the appeal en banc, we now hold that Section 522(f) applies to Thorp’s security interest and that it is not unconstitutional under the Fifth Amendment.
I
On October 4, 1978, Thorp lent the Giffords approximately $3,000 and in return took a security interest in two television sets, a rug, a tape recorder, a washer and dryer, and several pieces of their furniture. The loan was not used to purchase any of the items of collateral, and Thorp did not take possession of the collateral. On June 9, 1980, the Giffords filed a petition in bankruptcy and then sought to avoid the security interest in their household goods and furniture under 11 U.S.C. § 522(f)(2)(A). Section 522(f) provides:
Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under [11 U.S.C. § 522(b)], if such lien is—
(1) a judicial lien; or
(2) a nonpossessory, nonpurchase-money security interest in any—
(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
*450 (C) professionally prescribed health aids for the debtor or a dependent of the debtor.
Sections 522(b) and 522(d)(3) allow the Giffords exemptions for the collateral that is subject to Thorp’s security interest, not to exceed $200 for any particular item. Thus Thorp’s lien “impairs an exemption to which the debtor[s] would have been entitled under [Section 522(b) ].” Because each item of collateral qualifies as a household furnishing, household good, or appliance,[1] all the requirements for application of Section 522(f)(2)(A) are satisfied. Since no item of collateral is worth more than $200, if Section 522(f) is held to apply to Thorp’s pre-enactment security interest, the Giffords may avoid the security interest in its entirety.
Thorp contested avoidance of its lien before the bankruptcy court on the ground that application of Section 522(f) to pre-en7 actment liens would be unconstitutional. The bankruptcy court disagreed and held that Congress intended Section 522(f) to apply to pre-enactment liens and that there is no constitutional problem in doing so. 7 B.R. 814, 817-819 (Bkrtcy.). Thorp has appealed from that decision and we allowed the United States to intervene in the appeal as a respondent.
II
The first question is whether Section 522(f) was meant to apply to security interests that attached prior to its enactment. Section 522(f) was enacted as part of the Bankruptcy Reform Act of 1978 on November 6, 1978. Pub.L.No. 95-598, 92 Stat. 2578 (codified at 11 U.S.C. §§ 101 et seq.). Like the other substantive provisions of the 1978 Bankruptcy Act, however, Section 522(f) does not state when it — as opposed to the rest of the 1978 Act — is to apply. Rather, Congress placed all of its directions for the transition between the old and new bankruptcy laws in Title IV of the 1978 Act. Section 401 of Title IV provides that all former laws relating to bankruptcy are repealed. Section 402(a) states that “[ejxcept as otherwise provided in [Title IV], this Act shall take effect on October 1, 1979.” The combined effect of Sections 401 and 402(a) is to provide as substantive law only the 1978 Act for cases commenced on or after October 1, 1979. See generally 1 Collier on Bankruptcy KH 7-01, 7.02 (15th ed. 1982). Because Title IV provides no exceptions for Section 522(f), that Section must apply to cases filed on or after the effective date of October 1, 1979. Since the Giffords filed for bankruptcy on June 9, 1980, Section 522(f) is applicable to the security interest in their case.[2]
The other Courts of Appeals that have considered whether Section 522(f) applies to pre-enactment security interests agree that it does. Rodrock v. Security Industrial Bank, 642 F.2d 1193, 1196-1197 (10th Cir. 1981) (Section 522(f)(2) applies to pre-enactment security interests), probable jurisdiction noted sub nom. United States v. Security Industrial Bank, 454 U.S. 1122, 102 S.Ct. 969, 71 L.Ed.2d 108 (1981); In re Ashe, 669 F.2d 105 (3d Cir. 1982) (applying Section 522(f)(1), which permits avoidance of certain judicial liens, to pre-enactment cogno *451 vit note); see also In re Webber, 674 F.2d 796, 801-802 (9th Cir. 1982) (Section 522(f)(2) applies to pre-effective date liens). At oral argument, counsel for the United States told us without contradiction that some sixty-five bankruptcy court opinions have also interpreted Section 522(f) to apply to pre-enactment liens. See, e.g., In re Morris, 12 B.R. 321 (Bkrtcy.N.D.Ill.1981); In re Giles, 9 B.R. 135 (Bkrtcy.E.D.Tenn. 1981); In re Pillow, 8 B.R. 404 (Bkrtcy.D. Utah 1981). It is unnecessary to repeat here the reasoning laid out in those opinions. See also 669 F.2d at 475-478 (Cummings, C.J., dissenting). Again according to counsel, only five bankruptcy court opinions disagree.
Thorp has presented one argument that the prior cases do not address, however. A preliminary draft of the transition provisions stated that the new Bankruptcy Act “shall apply in all cases or proceedings instituted after its effective date, regardless of the date of occurrence of any of-the operative facts determining legal rights, duties, or liabilities hereunder.” H.R. 31 [also H.R. 32], 94th Cong., 1st Sess. § 10-103(a) [§ ll-103(a)] (1975), reprinted in Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the House Subcommittee on Civil and Constitutional Rights, 94th Cong., 1st Sess. App. 1 at 321 (1976). Thorp argues that because the above language was criticized by William Plumb in testimony before the House Subcommittee as an improper impairment of vested property rights and then deleted from the final version of the Act, Congress meant to preserve security interests that attached prior to enactment. See Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the House Subcommittee on Civil and Constitutional Rights, 94th Cong., 1st Sess. 2034, 2066-2067 (1976). But Mr. Plumb was only one of many witnesses to testify before Congress and there is no indication that the language was omitted because of fear of unconstitutionality.[3] We therefore attach little weight to his *452 concerns and construe the statute as it was finally enacted, requiring whole application of the new Act to bankruptcies filed on or after October 1, 1979, with immaterial exceptions.
Ill
The question presented by this appeal, then, is whether application of Section 522(f) to avoid Thorp’s pre-enactment lien in the Giffords’ household goods violates the Fifth Amendment.[4] Thorp argues primarily that Section 522(f) works an uncompensated taking of its property rights in the collateral, and alternatively, that Section 522(f) is a violation of substantive due process.
The two Courts of Appeals that have considered whether avoidance of a pre-enactment lien violates the Fifth Amendment have split on the issue. In Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), probable jurisdiction noted sub nom. United States v. Security Industrial Bank, 454 U.S. 1122, 102 S.Ct. 969, 71 L.Ed.2d 108, the Tenth Circuit held that “Congress may not under the bankruptcy power completely take for the benefit of a debtor rights in specific property previously acquired by a creditor.” 642 F.2d at 1198. The Rodrock Court did not state whether Section 522(f) effected a taking, deprived the creditor of property without due process, or was simply beyond Congress’ bankruptcy powers to enact. Instead, the Court relied completely upon the Supreme Court’s decision of Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, which invalidated relief provisions of the Frazier-Lemke Act of 1934.[5]
To the contrary, the Third Circuit in In re Ashe, 669 F.2d 105 (3d Cir. 1982) held that application of Section 522(f) to pre-enactment judicial liens did not violate the Fifth Amendment. The Ashe Court stated, “Only if a taking for public use is found does the just compensation standard apply. Plainly Section 522(f)(1) is an economic regulation rather than a taking for public use.” 669 F.2d at 110. Since this instance of economic regulation had a rational basis, the Third Circuit held that Section 522(f) comports with the requirements of due process. Id. at 110-111.
The Ninth Circuit recently held that the Fifth Amendment did not prohibit application of Section 522(f) to security interests in household goods that attached during the eleven-month period between enactment and the effective date of the new Act. In re Webber, 674 F.2d 796 (9th Cir. 1982). Quoting a dictum in our former majority opinion, the two-judge majority noted, also in dictum, “We agree that a ‘property right is of value regardless of the worth of the object in which it is held, and is protected from governmental appropriation by the taking clause of the Fifth Amendment.’ ” Id. at 803 n. 16 (quoting 669 F.2d at 473). But the quoted language is only a truism-all property is protected by the taking *453 clause to the extent that it applies — and the Ninth Circuit majority did not decide the constitutional question before us. Judge Sehroeder’s concurrence did not reveal her views on pre-enactment liens, and she wrote separately only to state that application of Section 522(f) to post-enactment, pre-effective date liens “does not present a substantial question, much less a close one.” Id. at 804.
As explained infra, we agree with the Third Circuit’s opinion in In re Ashe that Section 522(f) as applied to pre-enactment security interests does not violate either the due process or taking clauses of the Fifth Amendment.
IV
Section 522(f) quite clearly is valid under the due process clause. In the early years of this century, Congressional legislation was closely scrutinized by the courts under the rubric of “substantive due process.” See, e.g., Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937. But that approach has “long since been discarded” by the courts (Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93), and it is now well established that economic regulation will be sustained against substantive due process challenges provided the regulation has a rational basis. See, e.g., Williamson v. Lee Optical Co., 348 U.S. 483, 487-488, 75 S.Ct. 461, 464, 99 L.Ed. 563; United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234; In re Ashe, supra, 669 F.2d at 110. Even when a question of retroactivity is involved, “legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and * * * the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.” Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752; see also Brach v. Amoco Oil Co., 677 F.2d 1213 at 1224-25 (7th Cir. 1982). Indeed, under the bankruptcy clause of the Constitution,[6] “Congress may prescribe any regulations concerning discharge in bankruptcy that are not so grossly unreasonable as to be incompatible with fundamental law * * Hanover National Bank v. Moyses, 186 U.S. 181, 192, 22 S.Ct. 857, 862, 46 L.Ed. 1113.
The basis for Section 522(f) is both rational and compatible with fundamental law. Section 522(f) was enacted as part of a larger program “to make [traditional bankruptcy protections] more effective for non-business debtors.” 123 Cong.Rec. 35444 (1974) (statement of Rep. Rodino). Since the previous major revision of the bankruptcy laws in 1938, consumer financing had burgeoned into a major industry, and consumer bankruptcies had come to account for nearly 90% of all bankruptcy cases filed. Id.; H.R.Rep.No. 595, 95th Cong., 1st Sess. 4, 116 (1977). The existing bankruptcy law, however, had been addressed primarily to the problems involved in business bankruptcies and had relied on state exemption laws to protect consumer debtors. The state exemptions were quickly outmoded[7] as creditors “developed techniques that enablefd] them to avoid the effects of a debtor’s bankruptcy.” H.R.Rep.No. 595 at 116-117, U.S.Code Cong. & Admin.News 1978, p. 6077.
*454 In particular, security interests in consumer property, which formerly had been difficult to establish, became widespread following adoption of Article Nine of the Uniform Commercial Code in the middle 1960’s. See Schwartz, Security Interests and Bankruptcy Priorities: A Review of Current Theories, 10 J. Legal Stud. 1, 4-6 (1981). The result was that consumer debtors often came out of the bankruptcy proceedings “little better off than they were before.” Id. at 117, U.S.Code Cong. & Admin.News 1978, p. 6077.[8]
Finding that “there is a Federal interest in seeing that a debtor that goes through bankruptcy comes out with adequate possessions to begin his fresh start” (H.R. Rep.No. 595 at 126, U.S.Code Cong. & Admin.News 1978, p. 6087), Congress estab-' lished a framework to ensure that debtors would not be left completely destitute after bankruptcy. Congress began by providing a system of federal exemptions upon which a debtor might rely as an alternative to less favorable state exemptions. See 11 U.S.C. §§ 522(b), 522(d); H.R.Rep.No. 595 at 126-127. Congress was aware, however, that the existence of a right to exempt certain property from the bankrupt estate was not alone sufficient to provide a fresh start for the debtor. The Report of the Commission on Bankruptcy Laws of the United States advised Congress that valid exemptions often had been lost or denied under prior law, and recommended that neither waivers of exemptions nor nonpurchase-money security interests in household goods, wearing apparel, and health aids be enforceable. H.R.Doc.No. 137, 93d Cong., 1st Sess., Part I at 169, 170, 173 (1973). Congress enacted the Commission’s recommendations; Section 522(e) makes unenforceable a waiver of exemptions and, as noted above, Section 522(f)(2) allows the bankrupt to avoid a nonpossessory, nonpurchase-money lien in certain household and personal goods.
The House Report explained why it was necessary for the debtor to be able to avoid such liens:
Frequently, creditors lending money to a consumer debtor take a security interest in all of the debtor’s belongings, and obtain a waiver by the debtor of his exemptions. In most of these cases, the debtor is unaware of the consequences of the forms he signs. The creditor’s experience provides him with a substantial advantage. If the debtor encounters financial difficulty, creditors often use threats of repossession of all of the debtor’s household goods as a means of obtaining payment.
In fact, were the creditor to carry through on his threat and foreclose on the property, he would receive little, for household goods have little resale value. They are far more valuable to the creditor in the debtor’s hands, for they provide a credible basis for the threat, because the replacement costs of the goods are generally high. Thus, creditors rarely repossess, and debtors, ignorant of the creditors’ true intentions, are coerced into payments they simply cannot afford to make.
The exemption provision allows the debtor, after bankruptcy has been filed, and creditor collection techniques have been stayed, to undo the consequences of a contract of adhesion, signed in ignorance, by permitting the invalidation of *455 nonpurchase money security interests in household goods. Such security interests have too often been used by overreaching creditors. The bill eliminates any unfair advantage creditors have.
H.R.Rep.No. 595 at 127 (footnote omitted), U.S.Code Cong. & Admin.News 1978, p. 6088. See also In re Pillow, 8 B.R. 404, 406 (Bkrtcy.D.Utah 1981). Under the rule in Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004, a lien even in exempt property survives the bankruptcy discharge. Since Congress specifically stated that it was adhering to this rule (H.R.Rep.No. 595 at 361), without the lien-avoidance provisions of Section 522(f), liens such as Thorp’s would remain enforceable after the close of the bankruptcy proceedings.
Section 522(f) is narrowly drawn to permit avoidance only of nonpossessory, nonpurchase-money security interests in the listed items and only to the extent that these items are exempted property under Section 522(b). Section 522(f) is thus neither an irrational nor arbitrary means of effectuating a legitimate Congressional purpose under the bankruptcy laws — giving debtors “ ‘a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.’ ” Perez v. Campbell, 402 U.S. 637, 648, 91 S.Ct. 1704, 1710, 29 L.Ed.2d 233 (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230).[9] Thorp nevertheless argues that Section 522(f) will have the supposedly irrational effect of reducing nonpurchase-money credit extended to consumers such as the Giffords, as finance companies such as Thorp withdraw from the market. Indeed, all bankruptcy legislation makes borrowing by potential future bankrupts more difficult or expensive. See R. Posner, Economic Analysis of Law 293 (2d ed. 1977). “If Congress goes too far in undermining the security for extensions of credit when exercising plenary legislative power under the bankruptcy clause, the result may be that credit will be unavailable. But that is a matter of policy judgment for the legislative branch.” In re Ashe, supra, 669 F.2d at 111. We see no reason based on substantive due process to substitute our views “on the subject of Bankruptcies” (n. 6 supra) for those of Congress.
V
The remaining issue is whether avoidance of Thorp’s pre-enactment security interest is an uncompensated taking proscribed by the Fifth Amendment.
There is no “ ‘set formula’ for determining when ‘justice and fairness’ require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.” Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631. Rather than employing some single test of fairness {e.g., Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of “Just Compensation” Law, 80 Harv.L.Rev. 1165 (1968)) or economic efficiency (e.g., Berger, A Policy Analysis of the Taking Problem, 49 N.Y.U.L.Rev. 165, 185-191 (1974)), a taking analysis is bound up with the particular facts of each case. Nevertheless,
[i]n engaging in these essentially ad hoc, factual inquiries, the [Supreme] Court’s decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to *456 which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. See Goldblatt v. Hempstead, [369 U.S. 590,] 594 [82 S.Ct. 987, 990, 8 L.Ed.2d 130]. So, too, is the character of the governmental action. A “taking” may-more readily be found when the interference with property can be characterized as a physical invasion by government, see, e.g., United States v. Gausby, 328 U.S. 256 [66 S.Ct. 1062, 90 L.Ed. 1206] (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.
Penn Central, supra, 438 U.S. at 124, 98 S.Ct. at 2659. Again, in Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, the Supreme Court prescribed the two factual foci for a taking determination: “[1] the economic impact of the regulation, its interference with reasonable investment backed expectations and [2] the character of the governmental action * * Application of those factors to Thorp’s security interest in the Giffords’ household goods shows that the lien avoidance permitted by Section 522(f) does not contravene the taking clause.

The “Property” Interest Affected

First, the “investment backed expectations” interfered with are less than substantial. The cases that Thorp cites in which the Supreme Court found unconstitutional takings of liens are distinguishable because they involved much more substantial interests. Thorp’s nonpossessory, nonpurchasemoney security interest is far from “property” of the same importance as the farm mortgages taken in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, or the material-men’s liens on ships taken in Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554. The types of liens in Rad-ford and Armstrong attach to property of the debtor that has directly benefited from the loan or work done. A farm, for example, is mortgaged to buy land, seed, fertilizer or tools. A materialman’s lien attaches to a ship because the materialman has supplied the ship with material or labor. In either case, if the underlying debt is unpaid the creditor has a direct property interest in the objects that were purchased or created with the loaned capital or effort.
In contrast to such purchase-money interests, Thorp’s expectations reside in the threat of foreclosure rather than in the collateral. Unlike the advances in Rad-ford and Armstrong, the borrowed money here was not lent to purchase or improve the household goods listed in the security agreement. The Thirteenth Amendment prohibition against slavery and involuntary servitude prevents a creditor from taking a property interest in the direct beneficiary of his loan, the consumer. Therefore, as here, the creditor must settle for a security interest unrelated to the debt, such as in home furnishings needed by the consumer for ordinary living, and the creditor’s “reasonable investment backed expectations” are reduced accordingly. As several bankruptcy courts have recognized:
(1) there is no direct relationship between the value of the household goods taken as collateral for the consumer loan and the amount of the loan as exists [, for example,] in a mortgage of real estate;
(2) the value of the household goods is often nominal whereas realty has a measurable value comparable to the amount of the loan secured; and (3) the lender making small consumer loans, unlike a mortgagee, does not view a security interest in household goods as a potential substitute for the debt. * * * [T]hese courts have concluded that, since the household goods given as security have little or no actual monetary value to the creditor, whatever property interest the creditor has in the collateral does not rise to the level of a mortgagee’s property rights in realty.
Matter of Ward, 14 B.R. 549, 561 (S.D.Ga. 1981), summarizing In re Pillow, 8 B.R. 404, 418-420 (Bkrtcy.D.Utah 1981); In re Goodrich, 7 B.R. 590 (Bkrtcy.S.D.Ohio 1980); In re Webber, 7 B.R. 580, 584-586 (Bkrtcy.D.Or.1980); In re Curry, 5 B.R. 282 (Bkrtcy.N. *457 D.Ohio 1980); and In re Rutherford, 4 B.R. 510 (Bkrtcy.S.D.Ohio 1980).[10]
Thorp contends that the market value of the collateral is irrelevant to whether its security interest should be characterized as “property” and whether the government must pay for an injury to the security interest. The intervenor United States, on the other hand, argues that Thorp’s lien is merely an incident to a contractual right to repayment of a debt. Of course, the academic difference between contract and property rights is that the federal government may freely impair only the former, and even among private persons, contract rights are freely avoidable at “market value” whereas the owner of a property right may demand any payment to release the right or refuse to part with the property at
any price. See Calabresi & Melamed, Property Rules, Liability Rules and Inalienability: One View of the Cathedral, 85 Harv.L. Rev. 1089 (1972). The “property” interest that Thorp asserts here is that it should be allowed to continue threatening to take possession of the household goods as a means of inducing the Giffords to repay the $3,000. The value of such a “property” interest is independent of the “contract” value of the lien, i.e., the actual market value of the household goods. By failing to request the United States to compensate for the alleged taking, Thorp in effect concedes that it has no interest in the latter amount.[11] Moreover, Congress found during its legislative fact-gathering that creditors such as Thorp have no intention of repossessing the collateral.[12]
*458 The taking clause confuses Thorp’s dichotomy between contract and property, however, insofar as it would permit the government to take liens for a public purpose upon payment of only “just compensation.” Under the taking clause, the value of Thorp’s security interest can in no event be greater than its fair market or “just” value, which would be the market value of the collateral. See Cudahy Bros. Co. v. United States, 155 F.2d 905, 906-907 (7th Cir. 1946) (“just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined”); In re Pillow, 8 B.R. 404, 411 (Bkptcy.D.Utah 1981) (“Historically, lien rights have entitled their holders to the value of collateral and no more in bankruptcy”). There would be no justice in compensating Thorp based on some extortion value of the security interest. See Gordon, Unconscionability in Bankruptcy: The Federal Contribution to Commercial Decency, 66 Nw.U.L.Rev. 741, 765 (1972). Thorp knew[13] or should have known[14] at the time it entered into this security agreement that Congress was in the process of amending the bankruptcy laws to permit avoidance of such security interests. At best, assuming the courts would hold that Section 522(f) effects a taking, Thorp might have anticipated recovering as “just compensation” the value of the collateral. But since by all estimates the value of the collateral involved here is insignificant, Thorp’s “reasonable investment backed expectations” were insignificant also.
*459 Even if the label “property interest” is not illusory, the impact of Section 522(f) upon Thorp’s lien is insubstantial. First, Section 522(f) allows avoidance of a lien only to the extent that the debtor has an exemption under Section 522(b), here for up to $200 per item. The lien is not avoidable beyond that amount, and accordingly Section 522(f) only minimally affects a creditor whose investment-backed expectations reside in truly valuable collateral. Second, Section 522(f) does not apply until there is a bankruptcy, by which time the creditor’s expectations of repayment are surely at a minimum. In this case, Thorp had some 20 months following enactment of Section 522(f) prior to the Giffords’ bankruptcy during which to watch the Giffords more closely, and in the case of their default to enforce the security interest or threaten to do so. Although we do not know the facts in the instant case, ordinarily we might suppose that a debtor misses payments and is dunned by his creditors prior to filing for bankruptcy. If that were the case here, this particular lending agreement would have allowed Thorp to demand immediate repayment of the outstanding indebtedness. Thorp might also have attempted to negotiate a different lien on non-exempt property of the Giffords. Cf. Texaco, Inc. v. Short, 454 U.S. 516, 530-31, 102 S.Ct. 781, 792-93, 70 L.Ed.2d 738 (1982) (Indiana Mineral Lapse Act does not effect a taking because plaintiff failed to take advantage of an opportunity to take action that would have prevented loss). Finally, Congress has not entirely destroyed Thorp’s expectation of repayment but instead has substituted for it the rights of an unsecured creditor, which need not be equal in value to the expectations allegedly taken. “While these rights may well not have constituted ‘just compensation’ if a ‘taking’ had occurred, the rights nevertheless undoubtedly mitigate whatever financial burdens the law has imposed on [Thorp] and, for that reason, are to be taken into account in considering the impact of the regulation.” Penn Central, supra, 438 U.S. at 137, 98 S.Ct. at 2666. Together, these elements indicate that Section 522(f) is a de minimis interference that does not rise to the level of a taking under the Fifth Amendment.

The Character of the Government Action

Regarding the character of the government action, Section 522(f) is a dual adjustment of benefits and burdens between the debtor and his creditors, and among a narrow class of secured creditors and the debt- or’s general creditors. The rationality of this adjustment of benefits and burdens between debtor and creditor was discussed in this opinion’s substantive due process section supra. We note that the adjustment among the different types of creditors is rational also. It seems unlikely that Thorp had a significantly greater expectation of repayment than the Giffords’ other unsecured creditors, such as unsecured retailers, landlords, and credit-card companies. It is even more unlikely that any difference in expectations should be allowed a veto over Congress’ plenary power to make bankruptcy law. A fair reordering such as this of the competing claims of creditors to available funds of a bankrupt should be immune to a taking challenge. See Sax, Takings, Private Property and Public Rights, 81 Yale L.J. 149, 161 (1971).
The government action here is not of the nature of a physical invasion since Section 522(f)(2) does not apply to lenders who have possession of the collateral pursuant to possessory security interests. Common sense suggests a distinction between interfering with a limited class of Uniform Commercial Code remedies for nonpayment of debt by a bankrupt, and such governmental actions as bolting cable television equipment onto the roof of a building, Loretto v. Teleprompter Manhattan CATV Corp.,-U.S. ——, 102 S.Ct. 3164, 73 L.Ed.2d 868, allowing the public to use a formerly private pond, Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332, or ousting a tenant from his leasehold, United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; Devines v. Maier, 665 F.2d 138 (7th Cir. 1981). The former is impairment of an abstract incident to a contract right, while the latter are physical *460 invasions of tangible property. The type of lien here is a property right in the broad sense that, except for the government’s right to condemn for a public purpose, its holder may in certain circumstances exclude others from enjoying particular resources. But such a lien is not a property right in the sense that its holder possesses anything more than a bare legal title, or ever anticipates taking possession of the underlying collateral except perhaps as needed to make its more profitable threats of repossession credible. Our conception of property has not become so liberal that we can no longer distinguish, at least in narrow instances such as these, between property interests that are manifested by possession and transferred by delivery, and property interests merely photocopied onto the backside of consumer loan agreements.
Nor does Section 522(f) inure to the government’s own benefit. Thus this case is again distinguishable from Armstrong, supra, where the government “took” materialmen’s liens that encumbered government-owned ships. As the Third Circuit has stated as to the takings dichotomy, Section 522(f) is ordinary “economic regulation rather than a taking for public use.” In re Ashe, supra, 669 F.2d at 110.
In deciding whether this character of action is a taking, we must remember that an affirmative answer would either force significant abandonment of the Congressional purpose or entail Congressional compensation for disappointed lenders.
Suffice it to say that government regulation — by definition — involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. “Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.” Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 [43 S.Ct. 158, 159, 67 L.Ed. 322] (1922).
Andrus v. Allard, 444 U.S. 51, 65 [100 S.Ct. 318, 326, 62 L.Ed.2d 210]. Congress must have the freedom to adjust benefits and burdens when it acts pursuant to its bankruptcy powers, because — again, by definition — there are always too few funds of the bankrupt to make all of the creditors whole. The Fifth Amendment taking clause does not require Congress to be the guarantor of defaulting debtors.
Therefore, the order of the three-judge bankruptcy court allowing avoidance of Thorp’s security interest is affirmed.

. Thorp has not argued on appeal that the Giffords’ television sets or tape recorder should not be included as household furnishings, goods, or appliances. The dissent suggests that we are overly solicitous of the Giffords because their television sets and tape recorder are less essential to ordinary family living than most other items includible in Section 522(f)(2)’s enumeration. Dissent page 467 n. 11. Query whether the dissent’s analysis would be different had Thorp taken a nonpossessory, nonpurchase-money interest in a family pet or a home dialysis machine if needed by one of the Giffords’ children.

. Unlike the dissent, we do not find Section 522(f) so “absurd” that we will require Congress to depart from its scheme of placing temporal directions in a single part of the Act and ask that it tell us when Section 522(f) in particular should apply. Since we conclude infra that Section 522(f) is not unconstitutional, postponing its application in order to avoid “serious constitutional questions” (dissent page 25) would be a most unjustified form of judicial activism. To paraphrase Jeremy Bentham, “As in a dunghill here and there a grain of corn, so in the mass of judicial statute-helping here and there a grain of reason.” Bentham, 4 Works 494.

. The dissent makes a related argument that because Congress in its legislative history cited a Supreme Court decision invalidating 1934 bankruptcy legislation, Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, it must have believed Section 522(f) to be invalid also if applied to existing liens. Therefore, the dissent argues, Congress must have intended Section 522(f) not to apply to pre-enactment liens, or at least we would damage “no specific Congressional mandate” (dissent page 465) by construing it so.
With all respect the dissent turns pumpkins into carriages. The citation of a case in legislative history does not imply Congressional understanding or adoption of every proposition for which the case may arguably stand. Moreover, each citation of Radford in this legislative history is unconnected to any constitutional limitations upon Section 522(f). At one point, Radford is cited in connection with Section 522(c) (which provides that with certain exceptions property exempted under Section 522 is not liable for any prior debt of the debtor) by Senate Report No. 989, 95th Cong., 2d Sess. 76 and House Report No. 595, 95th Cong., 2d Sess. 361, reprinted in [1978] 5 U.S.Code Cong. & Ad.News 5787, 5862, 6316 for the proposition (stated identically in both reports) that “[t]he rule of Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property.” Long v. Bullard held that when “the creditor neither proved his debt in bankruptcy nor released his lien * * * his security was preserved notwithstanding the bankruptcy of his debtor.” 117 U.S. at 620-621, 6 S.Ct. at 918. Both reports refer only to page 583 of the Radford opinion, where Long v. Bullard is cited as historical support for the same proposition: “But unless the mortgagee released his security, in order to prove in bankruptcy for the full amount of the debt, a mortgage even of exempt property was not disturbed by bankruptcy proceedings.” 295 U.S. at 582-583, 55 S.Ct. at 859-60. Clearly, Congress cited these cases to explain its adoption of a technical bankruptcy rule in Section 522(c) as to exemptions but not to limit the effect of Section 522(f).
Radford is also cited in connection with Section 361 (which deals with adequate protection of an interest of an entity in property) by Senate Report No. 989, 95th Cong., 2d Sess. 49 and House Report No. 595, 95th Cong., 2d Sess. 339, reprinted in [1978] 5 U.S.Code Cong. & Ad.News 5835, 6295 as one of the sources of the notion of “adequate protection” for secured creditors such as the mortgagee in Radford. Section 361 is not at issue on this appeal nor applicable to the present exemption. In any case, under Section 361 and according to the House Report, such adequate protection would not exceed the value of the collateral, which in this case is worth much less to the creditor than the threat of foreclosure on the security interest (see p. 457 infra).

. “[Njor shall any person * * * be deprived of * * * property, without due process of law; nor shall private property be taken for public use, without just compensation.” U.S.Const. Amend. V.

. The Frazier-Lemke Act amended the post-Depression bankruptcy laws to permit farmers who defaulted on their mortgages to defeat actions to foreclose on their farms and remain in possession during a five-year foreclosure moratorium. The Act required the farmer to pay rent into court for the benefit of both secured and unsecured creditors and allowed the farmer to redeem his farm for its appraised value (rather than for the outstanding mortgage indebtedness) at any time during the five-year period. Pub.L.No. 486, ch. 869, 48 Stat. 1289 (1934); Radford, 295 U.S. at 575-576, 55 S.Ct. at 856-57. The Supreme Court invalidated the Act as an uncompensated taking of “rights in specific property which are of substantial value.” 295 U.S. at 601, 55 S.Ct. at 869. As discussed infra, the purchase-money mortgages avoided in Radford are distinguishable from Thorp’s lien because the former had “substantial value.” But in any event, the holding in Radford has been greatly weakened by subsequent decisions. See Wright v. Vinton Branch of the Mountain Bank of Roanoke, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736; John Hancock Ins. Co. v. Bartels, 308 U.S. 180, 184 n.3, 60 S.Ct. 221, 223 n.3, 84 L.Ed. 176; Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184; Helvering v. Griffiths, 318 U.S. 371, 400-401 n.52, 63 S.Ct. 636, 651-52 n.52, 87 L.Ed. 843.

. “The Congress shall have Power * * * [t]o establish * * * uniform Laws on the subject of Bankruptcies throughout the United States.” U.S.Const.Art. 1, § 8, cl. 4.

. Specifically, the House Report found:
Under current law, what property is exempt is determined under State law. However, some State exemption laws have not been revised in this century. Most are outmoded, designed for more rural times, and hopelessly inadequate to serve the needs of and provide a fresh start for modern urban debtors. The historical purpose of these exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge. The purpose has not changed, but neither have the level of exemptions in many States. Thus, the purpose has largely been defeated.
H.R.Rep.No.595 at 126 (footnotes omitted), U.S.Code Cong. & Admin.News 1978, p. 6087. See also 123 Cong.Rec. 35452 (1977) (statement of Rep. Drinan).

. In 1970 Congress established the Commission on the Bankruptcy Laws of the United States to investigate the need for bankruptcy law reform. Pub.L.No. 91-354, 84 Stat. 468. The Commission’s Report (H.R.Doc.No. 137, 93d Cong., 1st Sess., Part I (1973)) and a report prepared by the Brookings Institution (D. Stanley & M. Girth, Bankruptcy: Problem, Process, Reform (1971)) both recommended reform of the laws governing consumer bankruptcies. Rep. Edwards, the primary House sponsor of the Bankruptcy Reform Act, explained that both reports had found that:
[T]he debtor, while he might get a discharge in bankruptcy and be released from his debts, because of loopholes and difficulties with the law, he could find himself with a discharge that was not much good. He still would find after discharge that he owed too much money through nondischargeable debts or debts that he had been forced to reaffirm. Or he did not have enough property for a fresh start — the exemptions provided by the bankruptcy laws were inadequate.
123 Cong.Rec. 35446 (1977).

. The Supreme Court has noted the importance of a system of exemptions in furthering this purpose. In Bronson v. Kinzie, 42 U.S. (1 How.) 311, 315, 11 L.Ed. 143, the Court held that the special status of household necessities permitted a state to provide in insolvency legislation that such items be exempt from execution on judgments, noting that “[Regulations of this description have always been considered, in every civilized community, as properly belonging to the remedy, to be exercised or not by every sovereignty, according to its own views of policy and humanity.”. The items identified by the Court in 1843 as necessities parallel those items on which Section 522(f)(2) permits lien avoidance: “necessary implements of agriculture, or the tools of a mechanic, or articles of necessity in household furniture, [or] * * * wearing apparel * * 42 U.S. (1 How.) at 315.

. Wisconsin law establishing and regulating security interests also recognizes these distinctions between purchase- and nonpurchasemoney types of liens. The Wisconsin Consumer Act, for example, which provides special protection for “consumer credit transactions,” Wis.Stat.Ann. §§ 421.301(10), 422.102, does not apply to first mortgages on real estate, Wis.Stat.Ann. § 421.202(7); see also Miller, The Effect of WCA on Farm Credit, 46 Wis.Bar Bull. 20 (April 1973), or to “liens which arise by operation of law or by force of a mechanics’ lien or similar statute * * Holbrook & Bugge, Creditor's Responsibilities and Duties Under the WCA, 46 Wis.Bar Bull. 37, 43 (Feb. 1973). Thus while the Wisconsin Consumer Act applies to the security interest here, it would be inapplicable to the sort of property interests taken in Radford and Armstrong. Similarly, purchase-money security interests are accorded various priorities over “lien creditors” and nonpurchase-money security interests, Wis.Stat.Ann. §§ 409.301(2), 409.312(3) & (4), and may be created more easily in some instances. Wis.Stat.Ann. § 409.302(1)(d). These differences are not dispositive, but further evidence that nonpurchase-money security interests in consumer effects are not property interests whose taking must be compensated. Cf. Dames & Moore v. Regan, 453 U.S. 654, 674 n.6, 101 S.Ct. 2972, 2984 n.6, 69 L.Ed.2d 918 (President Carter’s nullification of attachment of Iranian assets was not a taking because there was no “property” interest in the attachment). Indeed Justice Brandéis later disavowed the taking rationale of his Radford opinion. Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke, 300 U.S. 440, 470, 57 S.Ct. 556, 565, 81 L.Ed. 736; see also Wright v. Union Central Life Ins. Co., 304 U.S. 502, 515 n. 17, 517-518 n.23, 58 S.Ct. 1025, 1033 n.17, 1034 n.23, 82 L.Ed. 1490.

. At oral argument Thorp claimed that the total value of the twelve items of collateral equalled or exceeded the $3,000 loaned to the Giffords. We find that highly unlikely in view of the bankruptcy court’s finding that each item was worth less than $200. Moreover, in response to questioning, counsel for Thorp conceded that debtors often exaggerate the .value of their goods, or appraise the goods at replacement cost rather than what the goods might bring at a garage sale.

. See Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc.No. 197, 93d Cong., 1st Sess., Part I at 169 (1973) (“The Commission is also of the opinion that nonpurchase-money security interests should not be enforceable as to items of property essential to a debtor’s well-being, such as wearing apparel, which are of little or no value to a creditor, other than as a means of coercing repayment.”); H.R.Rep.No. 595 at 127, U.S.Code Cong. & Admin.News 1978, p. 6088, quoted supra.
In Illinois, for example, there were 31,201 delinquent loans held by consumer finance companies during 1979 but only 25 repossessions, according to the 1980 Annual Report of the Illinois Department of Financial Institutions. See Matter of Morris, 12 B.R. 321, 350 (Bkrtcy.N.D.Ill.1981). “Such reports are not broken down between purchase-money and nonpurchase-money security interests, and it is reasonable to presume that most, if not all, of the collateral security repossessed represented purchase-money collateral.” Merrick, Constitutional Chaos: Rodrock v. Security Industrial Bank & Thorp Finance Corporation v. Gifford, 2 N.Ill.U.L.Rev. 167, 224 (1982).

. Thorp is a sophisticated, commercial creditor and the new Bankruptcy Act had been in process of enactment for almost a decade until finally enacted just one month after Thorp entered the security agreement here. Quite likely there were creditors who being informed of the impending legislation perfected as many of these security interests as possible prior to enactment in the hopes of evading the new Act’s lien-avoidance provisions. In Wisconsin, where this loan transaction took place, the financing statement that perfects the security interest is good for at least five years (Wis.Stat. Ann. § 409.403(2) & (3)) and the same security interest may be used to secure a series of different loans to the consumer. Wis.Stat.Ann. § 409.204(3). The particular security interest here was given ”[t]o secure payment and performance of the note and all renewals and extensions and all other obligations” owed by • the Giffords to Thorp. App.Doc. 1 at 6. Thus if Thorp were somehow able to exempt its lien from Section 522(f), it would be able to use the lien to secure continued lending to the Giffords for a period of four or more years after the effective date of the new Act.
The dissent suggests that the courts might avoid a pre-enactment security interest used as security for post-enactment lending on the theory that such lending creates a new security interest to which Section 522(f) is applicable. The distinction between pre- and post-enactment advances, however, is spurious. In either case, the dissent concedes that Congress may obliterate the contractual right of repayment for which the security is taken. And in either case, the “property” interest would have been created prior to enactment of Section 522(f); creditors had the same expectations under Wisconsin law of using their security interest to coerce repayment of the pre- and post-enactment advances.

. All parties to a contract are, of necessity, aware of the existence of, and subject to, the power of Congress to legislate on the subject of bankruptcies. They were and are chargeable with knowledge that their rights and remedies, in case the debtor becomes insolvent and is adjudicated a bankrupt, are affected by existing legislation which might be enacted.
In re Prima Co., 88 F.2d 785, 788 (7th Cir. 1937). See also Wright v. Union Central Ins. Co., 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490, quoting Home Bldg. & Loan Ass’n v. Blaisdell, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413:
The mortgage contract was made subject to the constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between plaintiffs and defendant. “Not only are existing laws read into contracts in order to fix obligations as between parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.”
Accord, Matter of Ward, 14 B.R. 549, 562 (S.D. Ga.1981); In re Bradford, 6 B.R. 741, 744 (D.Nev.1980); Matter of Teske, 9 B.R. 18, 20 (Bkrtcy.W.D.Mich.1981); In re Schulte, 8 B.R. 12, 16 (Bkrtcy.D.Kan.1980); In re Webber, 7 B.R. 580, 584 (Bkrtcy.D.Or.1980); In re Seltzer, 1 B.R. 80, 82 (Bkrtcy.D.Colo. 1980); In re Head, 4 B.R. 521, 524 (Bkrtcy.D.Tenn.1980); In re Steinart, 4 B.R. 354, 358 (Bkrtcy.W.D.La.1980). Cf. Wis.Stat.Ann. § 409.104(1) (“This chapter [regarding secured transactions] does not apply: (1) To a security interest subject to any statute of the United States * * *.”).